DISCIPLINARY COUNSEL *v.* HUNTER.

[Cite as *Disciplinary Counsel v. Hunter,*
106 Ohio St.3d 418, 2005-Ohio-5411.]

(No. 2004–1770—Submitted March 1, 2005—Decided October 26, 2005.)

**Per Curiam.**

{¶ 1} Respondent, Sandra K. Hunter of Solon, Ohio, Attorney Registration No. 0009526, was admitted to the practice of law in Ohio in 1977. On February 27, 2004, relator, Disciplinary Counsel, charged respondent in a second amended two-count complaint with violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on stipulations and other evidence, made findings of misconduct and a recommendation, which the board adopted.

Facts Underlying Counts I and II

*Count I*

{¶ 2} On April 6, 1999, respondent was appointed Evelyn Grundstein's guardian and was charged with overseeing Grundstein's welfare and assets, which exceeded $500,000. As guardian, respondent agreed to account for all expendi-

tures and income and had authority to expend estate assets only upon probate court approval.

{¶ 3} From September 1999 through March 2001, while serving as Grundstein's guardian, respondent misappropriated at least $180,000 from the guardianship estate. Respondent withdrew this money for her own use through several bank counter checks totaling over $83,000, ATM transactions totaling an estimated $27,000, and 38 other checks totaling over $80,000. Respondent marked several of these checks as being compensation for "attorney fees" or a "business loan"; however, she had no probate court approval for these payments.

{¶ 4} Respondent's embezzlement scheme began on September 14, 1999, when she withdrew without probate court approval over $84,000 from a $186,000 certificate of deposit belonging to her ward. Respondent then deposited these funds, dividing them between two bank accounts that she maintained for Grundstein's care. Her withdrawal cost the guardianship estate interest on the certificate of deposit and a $2,000 early-withdrawal penalty. Respondent later used these bank accounts as a source from which to misappropriate funds.

{¶ 5} Among numerous other transactions, respondent wrote a check to herself from a Grundstein bank account on September 17, 1999, for $31,000. On March 27, 2000, she wrote two bank counter checks also for her own use: one for $33,825.53 and another for $50,000. Respondent conceded under oath that she spent these sums for her own benefit; however, she could not specifically recall where much of the money went, and her bank records were of no help in explaining how she used the stolen funds.

{¶ 6} In November 2000, respondent began a solo law practice. Respondent used some of the stolen funds for her law firm startup and operation costs. She also used part of the funds for personal expenses, including acupuncture treatment and monthly massages.

{¶ 7} On Monday, April 2, 2001, Grundstein died. On the Saturday before Grundstein's death, as trustee of the Henry L. Wiech Trust, respondent moved $100,000 from the trust account to the Grundstein bank account to help conceal the prior theft.

{¶ 8} Respondent was later removed as Grundstein's guardian for failing to timely file a final account. Grundstein's next of kin hired attorney Kenneth Traeger to represent Grundstein's estate. Traeger reviewed guardianship paperwork and bank records and discovered respondent's extensive misappropriation. In May 2001, Traeger called respondent about his findings, but respondent failed to explain the reasons for the missing money. Afterward, she refused to return his telephone calls.

{¶ 9} When respondent did not reply to his inquiries, Traeger filed a motion to surcharge respondent for the missing funds. At a hearing in August 2001, respondent's attorney delivered a check to Traeger for $55,021.79 and also presented him with an application for $32,000 in legal fees for respondent's services as guardian. The application was never filed with the probate court.

{¶ 10} At a second hearing, respondent's attorney delivered another check to Traeger, this time for $42,000. Settlement discussions ensued and led to questions about the source of funds for the $100,000 deposit respondent made at the time of Grundstein's death. In response, respondent solicited a letter from Virginia R. Cook Lester, the primary beneficiary of the Wiech trust, in which Lester advised that she had lent respondent the $100,000 from the Wiech trust. The motion to surcharge was dismissed based on respondent's reimbursement and Lester's assurance that the $100,000 had come from a legitimate source.

*Count II*

{¶ 11} Lester was the stepdaughter of Henry L. Wiech, who died February 12, 2001. Wiech's estate contained approximately $33,000 in assets, and the Wiech trust was valued at an estimated $1,369,658. Wiech had chosen respondent to be executor of his will and successor trustee upon his death.

{¶ 12} In addition to being the primary beneficiary, Lester was also advisor to respondent as trustee of the Wiech trust, and the declaration of trust required that respondent consult with Lester prior to making any distributions. Notwithstanding this restriction, respondent withdrew $100,000 from the Wiech trust on March 31, 2001, without Lester's knowledge and deposited it into the Grundstein bank account.

{¶ 13} Respondent did not report her $100,000 withdrawal to Lester until late September or early October 2001. At that time, respondent recited a series of hardships and confessed to Lester that she had withdrawn $100,000 from the trust for her personal use. Respondent then assisted Lester in writing the letter designating as a loan the misappropriated $100,000.

{¶ 14} Respondent promised to repay the $100,000 by December 2001 with interest and to provide a signed promissory note documenting the loan. She did not also tell Lester that she had already used the money to partially repay funds that she had stolen from the Grundstein estate or that she hoped to exculpate herself for that theft with Lester's letter. Moreover, despite her promise, respondent neither repaid the $100,000 nor forwarded a promissory note by December 2001.

{¶ 15} The Ohio estate taxes for the Wiech estate were due in November 2001. Respondent, however, did not have the money to pay the taxes from either the

trust or the estate until October 2003. The Wiech estate was assessed over $5,000 in interest by the Ohio Department of Taxation for respondent's delay.

{¶ 16} Lester asked respondent repeatedly to send the promissory note for the $100,000 debt, but respondent did not do so until February 2003. Respondent also did not return many of Lester's telephone calls or respond to her letters asking for regular billing statements. And contrary to Lester's wishes, respondent did not provide bills for her time or account records from November 2002 through September 2003.

{¶ 17} For serving as executor and attorney for the Wiech estate and trustee and attorney for the Wiech trust for the three years after February 2001, respondent was paid over $98,000. She did not, however, tailor her billing practices to the particular service provided. Respondent's records indicate that she charged attorney rates for completing nonlegal administrative tasks, including picking up mail, depositing checks, paying bills, and arranging for lawn care, house cleaning, and the delivery of necessities.

{¶ 18} At a January 2003 deposition during the Grundstein investigation, respondent was asked whether she had misappropriated funds from any other sources. Respondent did not mention the $100,000 she took from the Wiech trust. Respondent has since claimed that after Lester's letter, which she argues ratified the $100,000 withdrawal, she considered the withdrawal a loan. At the panel hearing, however, respondent admitted that she viewed her withdrawal of $100,000 from the Wiech trust as a misappropriation. Because of respondent's silence on this issue, more than one year passed before relator discovered the Wiech trust embezzlement.

## Misconduct

{¶ 19} We find, consistent with the board's report, that by embezzling during a three-year period nearly $300,000 from two separate estates in her charge, respondent violated DR 1–102(A)(3) (barring illegal conduct involving moral turpitude), 1–102(A)(4) (barring conduct involving fraud, deceit, dishonesty, or misrepresentation), 1–102(A)(5) (barring conduct that is prejudicial to the administration of justice), 1–102(A)(6) (barring conduct that adversely reflects on the fitness to practice law), 2–106(A) (barring the charge or collection of an illegal or excessive legal fee), 9–102(B)(3) (requiring a lawyer to maintain complete records of and protect all client funds upon receipt), and 9–102(B)(4) (requiring a lawyer to promptly pay requested funds that a client is entitled to receive).

{¶ 20} In finding this misconduct, we reject respondent's argument that she did not commit a crime of moral turpitude. Respondent's embezzlement in the Grundstein case recently resulted in her conviction of felony theft in violation of R.C. 2913.02, for which we suspended her license to practice law for an interim

period pursuant to Gov.Bar R. V(5)(A)(1)(a). See *In re Hunter*, 105 Ohio St.3d 1554, 2005-Ohio-2424, 828 N.E.2d 110. Moreover, stealing from a guardianship, trust, or decedent's estate is illegal and immoral and violates DR 1–102(A)(3). See, e.g., *Disciplinary Counsel v. Muhlbach*, 104 Ohio St.3d 340, 2004-Ohio-6563, 819 N.E.2d 698, and *Columbus Bar Assn. v. Hamilton* (2000), 88 Ohio St.3d 330, 725 N.E.2d 1116.

{¶ 21} Respondent argues, however, that her mental disability weighs heavily against a finding of moral turpitude because, according to the medical evidence, her depression "inhibited" her judgment during the periods that she repeatedly stole large sums of money. Respondent insists that her depression clouded her understanding of right and wrong and thus diminished the quality of her judgment.

{¶ 22} We disagree. In explaining the severity of respondent's mental illness in 1999 and 2000, respondent's treating psychiatrist described her as "clearly impaired in her ability to think clearly," but he also said that she had "the capacity to recognize reality" and that her condition did not prohibit her from knowing right from wrong. Seizing on this testimony, relator's counsel urged the panel to account in its report for the difference between doing wrong while depressed and doing wrong because of depression. Although it is not clear that the panel or the board subscribed to this distinction, we do.

{¶ 23} No evidence established that respondent was so debilitated by her depression that she could not appreciate the gravity of her wrongdoing. Her own actions, in fact, dispel that notion. At the time of Grundstein's death, respondent realized that her theft would likely be discovered by whoever Grundstein's family selected to administer the estate. So immediately, respondent stole more money from another entrusted source to conceal her embezzlement. And months later, obviously still realizing the impropriety of her crime, respondent persuaded the unsuspecting Lester to "ratify" her theft as a loan.

{¶ 24} Where moral turpitude is disputed, an independent review of the circumstances underlying the illegal conduct is necessary to determine whether the conduct manifests the requisite lack of social conscience and depravity beyond any established criminal intent. See *Disciplinary Counsel v. Burkhart* (1996), 75 Ohio St.3d 188, 191, 661 N.E.2d 1062. We have conducted that review in this case and agree with the board that respondent's theft was motivated by an unmitigated interest in personal financial gain at others' expense. Our conclusion warrants a finding that respondent violated DR 1–102(A)(3).

{¶ 25} We also reject respondent's challenge to the board's finding that she charged an excessive fee. As discussed, the evidence establishes that respondent charged Lester legal fees for a variety of nonlegal services. This practice of

overcharging violates DR 2–106(A). *Cincinnati Bar Assn. v. Alsfelder*, 103 Ohio St.3d 375, 2004-Ohio-5216, 816 N.E.2d 218, ¶ 22–23.

## Sanction

{¶ 26} In determining the sanction for this misconduct, we review the aggravating and mitigating features of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). We adopt the board's findings in aggravation that respondent committed her misconduct out of greed and deceit. BCGD Proc.Reg. 10(B)(1)(b). And because respondent stole so much for so long, we also agree with the board that respondent engaged in a pattern of misconduct and committed multiple offenses. BCGD Proc.Reg. 10(B)(1)(c) and (d). Moreover, we share the board's and panel's skepticism as to respondent's candor and find it implausible that she could have withdrawn sums as large as $83,000 but could not remember how she spent them. Consistent with the board's report, we find that respondent took advantage of Lester's kindness and trust to conceal the misappropriation of money from the Wiech trust and to give the appearance of repayment in the Grundstein case.

{¶ 27} In mitigation, we find that respondent has no prior record of professional discipline. BCGD Prog.Reg. 10(B)(2)(a). She also claims to have repaid the clients the misappropriated sums. See BCGD Proc.Reg. 10(B)(2)(c). We hold, however, that the restitution was not mitigating because it was neither timely nor in good faith.

{¶ 28} Respondent, who suffers from post-polio syndrome and other physical ailments, also presented two character witnesses and numerous letters of recommendation that described her integrity and competence apart from the committed misconduct. See BCGD Proc.Reg. 10(B)(2)(e). The most extenuating circumstance of her case, however, is the mental disability from which she suffered during the underlying events. See BCGD Proc.Reg. 10(B)(2)(g).

{¶ 29} To have significant mitigating effect under BCGD Proc.Reg. (10)(B)(2)(g), a mental disability must be supported by all of the following: (1) a qualified health-care professional, (2) a determination that the mental disability contributed to the misconduct, (3) a sustained period of successful treatment, and (4) a prognosis from a qualified health-care professional that the attorney will be able to return, under specified conditions if necessary, to the competent, ethical, and professional practice of law. BCGD Proc.Reg. 10(B)(2)(g)(i), (ii), (iii), and (iv).

{¶ 30} Psychiatrist Dr. Jeffrey C. Hutzler testified that he diagnosed respondent with major depression in 2001 and that in his medical opinion, she had shown symptoms consistent with that condition for at least the two previous

years. According to Dr. Hutzler, respondent's mental disability also partially caused the misconduct she committed. Respondent has responded successfully to treatment, Dr. Hutzler reported, and has recovered to the extent that her diagnosis is now major depressive disorder, recurrent type, mild. Dr. Hutzler considers respondent's prognosis to be good and, providing she continues to adhere to her treatment regimen, he is confident that she will have no debilitating recurrence of her former symptoms and can return to the competent and ethical practice of law.

{¶ 31} Relator advocated respondent's disbarment before the panel. Respondent requested a two-year suspension, with the entire suspension period stayed upon conditions, including a monitored probation period of respondent's law practice. The board acknowledged that disbarment is the presumptive sanction for a lawyer's misappropriation of client assets. Adopting the panel's recommendation, however, the board credited respondent's mitigating evidence, particularly her mental disability, and recommended an indefinite suspension. The board further recommended conditions for respondent's reinstatement, including a candid accounting of the embezzled funds, proof of full restitution, and continued treatment for her mental illness.

{¶ 32} Upon review, we find the recommendation to indefinitely suspend inappropriate. To protect clients and the public, to ensure the administration of justice, and to maintain the integrity of the legal profession, see American Bar Association Center for Professional Responsibility, Standards for Imposing Lawyer Sanctions (1991 & Amend.1992), Standard 1.1., we instead order that respondent be permanently disbarred.

{¶ 33} Respondent raises three objections to the board's report. First, she contends that imposing an indefinite suspension is unfair and violates equal protection. In the second, she maintains that no evidence justifies an indefinite suspension. In the third, she asserts that the mitigation warrants a lesser sanction. As relator argues, the substance of all of her objections is that her case warrants a less onerous sanction than an indefinite suspension. We consider all the objections together.

{¶ 34} The appropriate sanction in a case of professional misconduct depends on "the duties violated, the actual injury caused, the attorney's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases." *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16; *Disciplinary Counsel v. King,* 103 Ohio St.3d 438, 2004-Ohio-5470, 816 N.E.2d 1040, ¶ 21.

{¶ 35} Here, respondent knowingly breached her duty to her clients. As evidenced by her violations of DR 1–102(A)(4) and 9–102, respondent treated Grundstein and Wiech, to whom she owed a fiduciary duty, with deceit and

dishonesty. In violating DR 1–102(A)(3), (4), and (5), respondent also compromised her duty to the public in general, ignoring the community's expectation that lawyers will protect their clients property and perform with integrity. Respondent's violation of DR 1–102(A)(5) and (6) and 2–106 similarly compromised her duty to her clients, the legal system, and the legal profession.

{¶ 36} The injuries suffered due to respondent's transgressions were immense. Respondent misappropriated nearly $300,000 from an incompetent ward and a trust that she had promised to protect. She also engaged in conduct that was misleading and designed to hide her embezzlement from Lester, Traeger, the probate court, and relator.

{¶ 37} Although relator no longer advocates disbarment, relator observes that "[t]he starting point for determining the appropriate sanction for misappropriation is disbarment." *Cuyahoga Cty. Bar Assn. v. Churilla* (1997), 78 Ohio St.3d 348, 350, 678 N.E.2d 515. "The continuing public confidence in the judicial system and the bar requires that the strictest discipline be imposed in misappropriation cases." *Cleveland Bar Assn. v. Belock* (1998), 82 Ohio St.3d 98, 100, 694 N.E.2d 897. Disbarment is the presumptive sanction for misappropriation. *Cleveland Bar Assn. v. Dixon*, 95 Ohio St.3d 490, 2002-Ohio-2490, 769 N.E.2d 816, ¶ 15.

{¶ 38} Respondent urges us to impose a sanction even more lenient than an indefinite suspension, mainly because of her mental disability. She relies on *Dayton Bar Assn. v. Gerren*, 103 Ohio St.3d 21, 2004-Ohio-4110, 812 N.E.2d 1280, in which after taking into account mitigating features not including mental disability, we suspended a lawyer's license to practice for six months because he misappropriated over $12,000 that he was obligated to pay on a client's behalf to a medical provider. Respondent suggested that a similar sanction is appropriate here because in finding the theft of client funds in *Gerren* intolerable, we said that "it is immaterial whether the [misappropriated] amount at stake is large or small." Id. at ¶ 14.

{¶ 39} Our statement in *Gerren* was not intended to establish a rule that all lawyers who steal from their clients will receive a six-month suspension. It was intended to advise lawyers that if they misappropriate even a relatively small amount of a client's funds, their license to practice law will be suspended. For theft and dishonesty of the magnitude committed in this case, the appropriate sanction is disbarment, even considering respondent's mental condition. "The appropriate sanction when a lawyer knowingly converts funds for the lawyer's benefit is disbarment." *Disciplinary Counsel v. Wherry* (2000), 87 Ohio St.3d 584, 587, 722 N.E.2d 515. Accord *Disciplinary Counsel v. Madden* (2000), 89

Ohio St.3d 238, 730 N.E.2d 379; *Cuyahoga Cty. Bar Assn. v. Bernardic* (1995), 74 Ohio St.3d 26, 656 N.E.2d 326.

{¶ 40} Respondent is therefore disbarred. Costs are taxed to respondent.

Judgment accordingly.

RESNICK, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

PFEIFER, J., concurs in judgment only.

MOYER, C.J., and LUNDBERG STRATTON, J., dissent.

---

**MOYER, C.J., dissenting.**

{¶ 41} I respectfully dissent from the sanction imposed on respondent by the majority. I believe that the record reveals the existence of mitigating factors sufficient to preclude imposition of the irrevocable sanction of permanent disbarment.

{¶ 42} It is fully appropriate for disbarment to be the presumptive disposition in a disciplinary case when an attorney has stolen from clients. Respondent without question egregiously violated the trust of her clients and her responsibilities to them, as well as to the profession. However, by definition, a presumptive sanction of disbarment does not preclude the application of mitigation. That is, the presumption in favor of disbarment in the case of theft from clients is a rebuttable one.

{¶ 43} This court has rightly acknowledged that the mental illness of an attorney, where proven, should be considered in mitigation when the relationship between that illness and the attorney's conduct meets certain criteria. Section 10(B)(2)(g) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.") instructs the board that it may consider mental disability as mitigating when all of the following are present:

{¶ 44} "(i) A diagnosis of a * * * mental disability by a qualified health care professional * * *;

{¶ 45} "(ii) A determination that the * * * mental disability contributed to cause the misconduct;

{¶ 46} "(iii) * * * [A] sustained period of successful treatment;

{¶ 47} "(iv) A prognosis from a qualified health care professional * * * that the attorney will be able to return to competent, ethical professional practice under specified conditions."

{¶ 48} In adopting BCGD Proc.Reg. 10(B)(2)(g), the court established as policy that, while attorney misconduct caused, in part, by an illness of the brain should not be excused, the fact of mental disability or illness should be meaningfully considered in determining a sanction. I am not persuaded that imposition of disbarment in this case is consistent with recognition of respondent's mental disability.

{¶ 49} In the case at bar, two competent and highly credentialed medical doctors—one a published author of medical texts and a professor of psychiatry at the Cleveland Clinic and the other a psychiatrist retained by the board itself—evaluated respondent's mental health at the time of her misconduct and following treatment. Both came to professional opinions that respondent suffered from a major depressive disorder. Their testimony clearly establishes the presence of each of the factors set forth in BCGD Proc.Reg. 10(B)(2)(g).

{¶ 50} Jeffrey C. Hutzler, M.D., a psychiatrist, testified regarding respondent's mental health. Hutzler has served on the faculty of the medical schools of the Ohio State University and the Cleveland Clinic and first saw respondent as a patient in June 2001. He testified that respondent met the diagnosis of mental illness set forth in R.C. 5122.01(A)[1] and described her as having "a substantial disorder of mood, * * * of memory, and * * * impaired judgment. * * * [S]he was clearly depressed, which was a problem of mood which was significant." Dr. Hutzler believed that respondent had first experienced depression in 1998 or 1999 and had not fully recovered by the time of their initial appointment.

{¶ 51} Dr. Hutzler testified that her mental-health problems impaired her ability to distinguish right from wrong. When asked by a panel member whether respondent's major depression contributed to cause her acts of dishonesty, Dr. Hutzler responded: "I don't think there is any question that it certainly interfered with her judgment and certainly had an effect on her acts of dishonesty." In April 2004, his diagnosis of respondent was major depressive disorder, recurrent type, mild, and in remission. He recommended ongoing psychotherapy and testified that his prognosis for respondent was good and that she was likely to recover fully.

{¶ 52} At the request of the board, Dr. Peter Geier conducted an independent psychiatric evaluation of respondent in April 2003. He concluded that respondent had suffered from major depressive disorder from January 2000 through June 2001, but did not suffer from any mental illness at the time of the evaluation.

---

1. R.C. 5122.01(A) defines mental illness as "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."

{¶ 53} These unrebutted opinions, expressed with reasonable medical certainty, demonstrated each of the criteria set forth in BCGD Proc.Reg. 10(B)(2)(g). In imposing the sanction of permanent disbarment despite this medical evidence, the majority has not given adequate credit in mitigation to respondent's diagnosed mental illness.

{¶ 54} In addition, the board received more than 30 letters of endorsement from individuals representing a wide spectrum of the community, including attorneys, judges, clients, and community activists. Despite the egregious misconduct proven by the board during the years surrounding the active phase of her depression, those who have known respondent over many years repeatedly described her as trustworthy, honest, and unusually caring towards her primarily elderly clients. Although such communications are often not relevant to the conduct for which a respondent is sanctioned, they are helpful here in placing respondent's conduct in perspective. One writer observed, "[C]linical depression * * * must have been a significant factor in Sandra's recent problems as I cannot imagine Sandra engaging in such conduct under any other circumstance." The letters describe respondent as "trustworthy, altruistic, easy to work with and reliable"; "one of the most knowledgeable, caring and honest attorneys in the office"; "professional in her conduct, very honest and forthcoming"; "honest, fair and completely within the parameters of her legal expertise professionally"; "concern[ed] for the feelings and welfare of her clients"; "a person of the highest degree of integrity and trustworthiness" who has always adhered to the "highest ethical standards" and "has [the colleague's] complete trust and respect"; and "an excellent attorney—trustworthy, honest, accurate, and punctual with complete knowledge of the laws of Ohio." One client expressed her hope that respondent "will still be here when [she dies] to help [her] children in a difficult time as she has helped" the client.

{¶ 55} The majority imposes the most severe sanction available for attorney misconduct, even though that sanction was not recommended by the panel that heard the witnesses or the board; nor is it now sought by relator. While this court is responsible for imposing attorney discipline in order to protect the public from a recurrence of similar conduct, we have adopted rules and programs that enable us to achieve this goal without ordering disbarment. Should respondent seek reinstatement from an indefinite suspension after the expiration of the two-year period established by Gov.Bar R. V(10)(B), she would be required to establish "by clear and convincing evidence" that she "possesses all of the *mental,* educational, and *moral qualifications* that were required of an applicant for admission to the practice of law in Ohio at the time of * * * her original admission" and that she "is now a proper person to be readmitted to the practice of law in Ohio, notwithstanding the previous disciplinary action." (Emphasis added.) Gov.Bar R. V(10)(E)(2) and (4). An application for reinstatement would

trigger a hearing by the board to "take and report evidence relevant to the rehabilitation of the petitioner and his or her possession of all the *mental,* educational, *and moral* qualifications" required of an applicant to the bar. (Emphasis added.) Gov.Bar R. V(10)(F). Even then, this court has the authority to order a conditional reinstatement. Gov.Bar R. V(10)(E)(4).[2]

{¶ 56} This record does not support disbarment. The public would be adequately protected by imposition of an indefinite suspension with the conditions recommended by the board and with the expectation that a full mental-health review would be conducted if and when respondent applied for reinstatement.

{¶ 57} The panel concluded that the matters offered in mitigation, particularly respondent's "resolved mental disability which contributed to cause the misconduct she is charged with," justified a sanction less than disbarment. It concluded that "the interests of the profession and society would be better served by permitting her to return to the practice of law upon demonstrating restitution and continued mental health—and candidly admitting where the funds went which she stole." I agree.

{¶ 58} I would accept the recommendation of the board and would indefinitely suspend respondent from the practice of law in Ohio with the conditions proposed by the board.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Robert R. Berger, Assistant Disciplinary Counsel, for relator.

Mary L. Cibella, for respondent.

---

2. Gov.Bar. R. provides, V(10)(E)(4) "The order of reinstatement may be subject to conditions the Supreme Court considers appropriate including, but not limited to, requiring the petitioner to serve a period of probation on conditions the Supreme Court determines * * *."