[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Adams*, Slip Opinion No. 2024-Ohio-559.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-559

DISCIPLINARY COUNSEL *v*. ADAMS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Adams*, Slip Opinion No. 2024-Ohio-559.]

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct— Permanent disbarment and restitution ordered.*

(No. 2022-1256—Submitted July 18, 2023—Decided February 20, 2024.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2022-039.

_____

**Per Curiam.**

{¶ 1} Respondent, Dennis Lee Adams, Attorney Registration No. 0068481, whose last known address was in Hamilton, Ohio, was admitted to the practice of law in Ohio in 1997.

{¶ 2} On September 2, 2022, relator, disciplinary counsel, filed a four-count complaint with the Board of Professional Conduct, alleging among other things that

Adams neglected three client matters, failed to reasonably communicate with those clients, misappropriated their settlement funds, made false representations to clients and at least one other attorney, and failed to cooperate in the ensuing disciplinary investigations.

{¶ 3} On November 2, 2022, we suspended Adams's license on an interim basis based on his failure to respond to relator's complaint in this case. *See* 2022-Ohio-3898. We found Adams in contempt of court in January 2023 for his failure to file an affidavit of compliance with our interim suspension order. 168 Ohio St.3d 1524, 2023-Ohio-63, 200 N.E.3d 1139.

{¶ 4} In March 2023, we granted relator's motion to remand this case to the board to seek Adams's permanent disbarment, *see* Gov.Bar R. V(14)(D). 169 Ohio St.3d 1453, 2023-Ohio-660, 204 N.E.3d 556. Later that month, relator filed a motion for default disbarment supported by more than 75 sworn or certified exhibits, including the affidavits of four of Adams's clients, eight attorneys (seven of whom had had professional dealings with him or his clients), an assistant disciplinary counsel, three other employees of the Office of Disciplinary Counsel, and an employee of the Ohio Bureau of Workers' Compensation. *See* Gov.Bar R. V(14)(F).

{¶ 5} The board referred relator's motion for disbarment to an attorney commissioner for disposition pursuant to Gov.Bar R. V(14)(F)(2)(a). The commissioner found that relator had submitted clear and convincing evidence to establish that Adams committed 19 ethical violations. Five other alleged violations were dismissed based on the insufficiency of the evidence.

{¶ 6} The commissioner recommended that Adams be permanently disbarred for his misconduct and be ordered to make restitution of more than $25,000 to his clients and others harmed by his misconduct. The board adopted the commissioner's findings of fact and conclusions of law and agreed that Adams should be permanently disbarred. After thoroughly reviewing the record, we adopt

the board's findings of misconduct, permanently disbar Adams from the practice of law, and order him to make restitution as set forth below.

## MISCONDUCT

### Count 1—The McAdams Matter

{¶ 7} In July 2017, Teresa and Jerry McAdams retained Adams to represent them relative to injuries that Teresa had sustained in an automobile accident. Teresa signed a contingent-fee agreement providing that Adams would be entitled to 33 percent of the gross amount recovered.

{¶ 8} Adams filed a lawsuit in the Butler County Court of Common Pleas on behalf of the McAdamses against the other driver involved in the accident and Allstate Fire and Casualty Insurance Company, Teresa's uninsured/underinsured-motorist-coverage ("UM/UIM") carrier. In July 2018, Adams settled the claim against the other driver for $22,000. When the McAdamses met with Adams to indorse the settlement check, Adams told them that he would pay Medicaid and Medicare liens arising from Teresa's accident-related medical treatment and that he would hold the remainder of the settlement proceeds in his client trust account to pay the expenses of the ongoing litigation against Allstate. After depositing the settlement check into his client trust account, Adams paid himself $1,500 and paid the $1,768.26 Medicaid lien. But he did not pay the $3,969.75 Medicare lien, nor did he distribute any settlement proceeds to the McAdamses.

{¶ 9} On March 12, 2019, Adams filed a notice voluntarily dismissing the McAdamses' UM/UIM case against Allstate. He then emailed Teresa to inform her that she did not need to attend the pretrial hearing scheduled for the next day, without informing her that he had dismissed her case. Thereafter, Adams ignored periodic requests from Teresa for information regarding the status of the case, and he failed to refile her UM/UIM case within the one-year time limit applicable under R.C. 2305.19(A).

**{¶ 10}** In August 2019, Teresa received a letter from the United States Department of the Treasury informing her that her monthly Social Security benefit would be reduced by up to 15 percent to satisfy the outstanding Medicare lien. Teresa forwarded the letter to Adams, but he did not respond. After she reached out to Adams a second time, he agreed to meet with her. During that meeting, Adams told Teresa he would take care of the Medicare/Treasury matter and that he expected to reach a settlement with Allstate by the end of the year. He once again failed to disclose that he had dismissed the McAdamses' case against Allstate.

**{¶ 11}** Teresa repeatedly asked Adams to address Treasury's recoupment of the Medicare lien and to update her on the status of her case against Allstate. On occasion, he requested additional documents or offered excuses for his failure to communicate with Teresa, but he offered no substantive response to her inquiries. In an April 2021 email to Adams, Teresa noted that it had been more than a year since she had heard from him. Around that time, the McAdamses consulted with another attorney, who informed them that Adams had dismissed their case against Allstate more than two years earlier and that he had not refiled it.

**{¶ 12}** After retaining new counsel in September 2021, the McAdamses sent Adams a letter terminating his representation and instructing him to send their file along with any money held on their behalf to their new attorney. Adams failed to comply with that request.

**{¶ 13}** Despite his earlier representations to Teresa, Adams never paid the Medicare lien. His bank records show that in October 2020, his client-trust-account balance had dropped to just $231.49—though he should have held more than $20,000 of the McAdamses' settlement proceeds in the account at that time. And by July 1, 2022, Treasury had withheld $3,993.68 from Teresa's Social Security benefits to satisfy the Medicare lien, which had grown to more than $4,100 with interest.

**{¶ 14}** Under his contingent-fee contract with Teresa, Adams was entitled to a fee of $7,260 and the McAdamses are entitled to the remaining settlement proceeds, less any legitimate costs and expenses paid by Adams—which to date consist solely of the $1,768.26 Medicaid lien. Therefore, the McAdamses are entitled to receive $12,971.74.

**{¶ 15}** In January 2022, the McAdamses filed a malpractice complaint against Adams in the common pleas court. Adams failed to enter an appearance or answer and failed to appear at a hearing on the McAdamses' motion for default judgment and damages. In January 2023, the court granted that motion and ordered Adams to pay the McAdamses $272,284.65 in compensatory and punitive damages and attorney fees, plus court costs and prejudgment interest.

**{¶ 16}** The board found that relator had presented clear and convincing evidence that Adams's conduct in the McAdams matter violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client), 1.4(a)(1) (requiring a lawyer to inform a client of any decision or circumstance with respect to which the client's informed consent is required), 1.4(a)(3) (requiring a lawyer to keep a client reasonably informed about the status of a matter), 1.4(a)(4) (requiring a lawyer to comply as soon as practicable with a client's reasonable requests for information), 1.15(c) (requiring a lawyer to deposit advance legal fees and expenses into a client trust account, to be withdrawn by the lawyer only as fees are earned or expenses incurred), 1.15(d) (requiring a lawyer to promptly deliver funds or other property that the client is entitled to receive), 1.16(d) (requiring a lawyer to promptly deliver client papers and property as part of the termination of representation), 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice).

{¶ 17} In addition, the board recommends that Adams be required to pay the McAdamses restitution in the amount of $12,971.74,[1] representing their share of Teresa's personal-injury settlement. A similar amount is also included in the compensatory damages awarded to the McAdamses in their malpractice action.

{¶ 18} We adopt the board's findings of misconduct and agree that the McAdamses are entitled to $12,971.74 in restitution.

## Count 2—The R.R. Matter[2]

{¶ 19} In November 2016, R.R. retained Adams to represent him relative to personal injuries he had sustained in an automobile accident that occurred in the course of his employment. Their contingent-fee agreement provided that Adams was entitled to 33 percent of any settlement. In October 2017, Adams filed a complaint against the other driver involved in the accident, Muhyadin Mohamed, and Mohamed's employer, FedEx Custom Critical, Inc. ("FedEx"), in the Preble County Court of Common Pleas.

{¶ 20} During Adams's representation of R.R., the Bureau of Workers' Compensation ("BWC") sent Adams four letters informing him that it had paid nearly $11,000 in claims related to the accident. Those letters instructed Adams to obtain the final lien amount from BWC before settling R.R.'s case. In August 2019, R.R. agreed to settle his claim for $17,000. Adams did not notify BWC or obtain the final lien amount before finalizing the settlement, nor did he pay the lien. He

---

1. Due to an apparent typographical error, the amount reads as $2,971.74 in the concluding paragraph of the board's report.

2. Because this count involves a Bureau of Workers' Compensation claim, relator and the board have identified the affected client by his initials, R.R., for the purpose—according to the board's report—of "preserv[ing] the statutory, nonpublic status of identifying information concerning BWC claimants." Our use of the client's initials for purposes of this opinion should not be construed as an adoption of the board's view that anonymity is statutorily required in this circumstance. *See* R.C. 4123.88(B) (providing that BWC claim files, including any information directly or indirectly identifying the name, address, or telephone number of a claimant—regardless of whether the claimant's claim is active or closed—are not public records for purposes of Ohio's Public Records Act, R.C. 149.43).

deposited the settlement check into his client trust account in September 2019 and collected his contingent fee of $5,610 two days later.

{¶ 21} Adams did not respond to R.R.'s inquiries regarding the settlement proceeds until R.R. made an unannounced visit to Adams's office in December 2019 to obtain his share. At that time, Adams gave R.R. a check for $6,540.07 and informed him that he was holding the remainder of the settlement proceeds (i.e., $4,849.93) to pay the BWC lien. But after R.R.'s check was deducted, the balance in Adams's client trust account was just $1,090.99.

{¶ 22} Adams told R.R. that he would attempt to negotiate the amount of the BWC lien, but he failed to do so and ignored BWC's attempts to contact him. He finally notified BWC of the settlement by email in February 2020. BWC promptly responded, informing Adams that it would accept $5,300 to settle its nearly $11,000 lien. But Adams ignored the letter and BWC's subsequent efforts to communicate with him.

{¶ 23} BWC referred the matter to the Office of the Ohio Attorney General for collection and later filed a complaint against R.R., Mohamed, and FedEx seeking payment of the entire lien. The attorney for Mohamed and FedEx tried to communicate with Adams, reminding him that he had represented that he would pay the BWC lien out of the settlement proceeds, but Adams did not respond.

{¶ 24} Mohamed and FedEx answered the BWC complaint. They also filed a cross-claim against R.R. and a third-party complaint against R.R.'s wife, Adams, and Adams's law office. R.R. and his wife retained new counsel to represent them in those proceedings. When their counsel spoke to Adams, Adams stated that the remainder of R.R.'s settlement proceeds (i.e., the $4,849.93 he had retained to resolve BWC's lien) were in his client trust account and that he would contact BWC's counsel to settle the claim. But Adams's client trust account contained just $231.49 at that time, and Adams took no action to resolve the claim.

**{¶ 25}** In March 2021, the common pleas court granted Mohamed and FedEx's motion for a default judgment with respect to their third-party complaint against Adams. The court further ordered Adams to indemnify Mohamed and FedEx for all economic damages they might be ordered to pay to BWC, along with their attorney fees, costs, and expenses associated with BWC's action against them. As part of a global settlement agreement, FedEx paid $5,300 as full and final settlement of BWC's claim against R.R. The court subsequently ordered Adams and his law office to reimburse FedEx and Mohamed for that payment and to pay the costs of the proceeding, which according to the docket in that case are $542.69. All remaining claims were dismissed.

**{¶ 26}** The board found that relator had presented clear and convincing evidence that Adams's conduct in the R.R. matter violated Prof.Cond.R. 1.3, 1.4(a)(3), 1.15(c), 1.15(d), 8.4(c), and 8.4(d).

**{¶ 27}** In addition, the board recommends that Adams be required to pay the court costs incurred in BWC's action to enforce its lien in Preble County C.P. No. 20CV032045. The board also recommends that Adams be required to pay restitution in the amounts of $5,300 to FedEx to compensate for its double payment of R.R.'s BWC lien, $3,836 to R.R. and attorney Kevin Connell for legal fees incurred in connection with R.R.'s defense against BWC's efforts to enforce its lien, and an additional $4,849.93 to R.R. We note, however, that the $4,849.93 the board found is owed to R.R. actually represents the amount that Adams withheld from the settlement proceeds to settle the BWC lien. We therefore conclude that that amount is more properly considered part of the $5,300 that Adams owes to FedEx rather than an amount that R.R. is entitled to receive.

**{¶ 28}** On these facts, we adopt the board's findings of misconduct and agree that Adams owes $542.69 in court costs to the Preble County Court of Common Pleas, restitution in the amount of $5,300 to FedEx, and attorney fees of $3,836 to R.R. and/or Connell.

**Count 3—The Weske Matter**

{¶ 29} In January 2013, Eileen Weske retained Adams to represent her in a personal-injury case arising from an automobile accident. She agreed to pay him a 33 percent contingent fee. Before Adams filed a complaint on behalf of Weske, Bethesda Hospital filed a complaint against Weske in the Hamilton Municipal Court, seeking payment for medical treatment related to the accident. After Adams answered Bethesda's complaint, Weske agreed to a judgment awarding Bethesda $680.76, to be held in abeyance until her personal-injury case was resolved. The agreed entry was filed in December 2014, around the time Adams filed Weske's personal-injury complaint.

{¶ 30} In January 2017, Adams voluntarily dismissed Weske's personal-injury case without prejudice. Approximately ten days later, Bethesda's counsel inquired about the status of the case. Adams replied, stating that he was "actively working to get the matter settled and hope[d] to have the matter resolved within the next (90) days." He also assured Bethesda's counsel that "any proceeds from the settlement [would] be used to pay this outstanding judgment."

{¶ 31} Adams refiled Weske's personal-injury case in January 2018. Two weeks later, Weske agreed to accept $12,500 from the defendant's insurer and $2,500 from her own UM/UIM carrier to settle the case. Within a few days after Adams deposited the $12,500 settlement check into his client trust account, he wrote two checks for his fees: one to himself for $1,000, then another to his law firm for $3,000.

{¶ 32} Adams failed to respond to an inquiry from Bethesda's counsel regarding the status of Weske's case around the time he issued himself another $1,000 check for "Weske Expenses." In mid-March 2018, Adams deposited the $2,500 settlement check from the UM/UIM carrier and wrote himself a $459.28 check for "Weske Costs."

{¶ 33} On March 30, 2018, Adams disbursed $6,025.31 of the settlement proceeds to Weske and held the remaining $3,515.41 in his client trust account. Thereafter, Adams did not respond to multiple inquiries from Bethesda's counsel regarding the status of the case and waited until September 2019—approximately 18 months after he paid himself and more than four months after Bethesda filed suit against him—to pay Bethesda's $680.76 judgment.

{¶ 34} Under his contract with Weske, Adams was entitled to a contingent fee of $4,950 (33 percent of $15,000) plus costs and expenses; he paid himself a total of $5,459.28 from Weske's settlement proceeds. Because Adams failed to cooperate in the resulting disciplinary investigation, relator was unable to verify the authenticity of Adams's claimed costs and expenses or to account for the remaining $2,777.72 of Weske's settlement proceeds. Consequently, the board concluded that Weske was entitled to, but had not received, an additional $3,287 of the settlement proceeds.

{¶ 35} The board found that relator had presented clear and convincing evidence that Adams violated Prof.Cond.R. 1.3, 1.4(a)(3), and 1.15(d). We adopt these findings of misconduct and agree that Weske is entitled to restitution in the amount of $3,287.

### Count 4—Failure to Cooperate in the Disciplinary Process

{¶ 36} Adams received relator's first letter of inquiry regarding the McAdams matter in January 2022. He requested and received an extension of time to respond. He did not, however, submit his response by the new deadline. Nor did he respond to relator's multiple subsequent efforts to communicate with him.

{¶ 37} Consequently, in May 2022, relator served Adams with a subpoena for his deposition. Adams acknowledged receipt of the subpoena and requested a two-week continuance to consult or retain counsel, stating that he intended to prioritize resolving relator's investigation.

10

**{¶ 38}** Relator agreed to continue the deposition on the conditions that Adams inform relator of the identity of his counsel by May 27, provide a detailed written synopsis of his representation of the McAdamses and an accounting of their settlement proceeds by June 6, and appear at relator's office in Columbus for the deposition on June 14. Although Adams agreed to those terms, he did not make the required disclosures—even after relator reminded him of his agreement and informed him that the deposition would not be continued again. On June 13, Adams sought another continuance, claiming that health issues had limited his ability to prepare for the deposition. Rather than continue the deposition, relator offered Adams the opportunity to participate by videoconference.

**{¶ 39}** Adams ultimately appeared for the deposition, but in response to many of relator's questions regarding his handling of the McAdamses' case, he claimed that he could not recall what had happened. And when asked why his client trust account contained just $290.99 in August 2020 even though he had not disbursed any settlement proceeds to the McAdamses, he answered, "Ma'am, I cannot tell you. It's part of what I'm trying to figure out for myself." He claimed that due to a computer crash that had occurred more than nine months earlier and health issues that had affected his memory, concentration, vision, and balance, he would need an additional 60 days to reconstruct and go back through his files to determine what had happened to the McAdamses' settlement proceeds.

**{¶ 40}** During his deposition, Adams agreed to search his physical files to see whether he could determine what had happened to the McAdamses' settlement proceeds. The day after the deposition, relator sent Adams a letter requesting that information, a complete copy of the McAdams file, a brief explanation of his representation and distribution of funds on behalf of several other clients, and information regarding the computer crash he claimed he had experienced. McAdams did not provide the requested information or the file, even after relator served him with a subpoena duces tecum ordering him to produce the documents.

**{¶ 41}** The board found that relator had presented clear and convincing evidence that Adams's conduct violated Prof.Cond.R. 8.1(b) (prohibiting a lawyer from knowingly failing to respond to a demand for information by a disciplinary authority during an investigation).  We adopt this finding of misconduct.

## SANCTION

**{¶ 42}** When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

**{¶ 43}** In determining the appropriate sanction to recommend for Adams's misconduct, the board acknowledged that "[d]isbarment is the presumptive sanction for misappropriation," *Disciplinary Counsel v. Hunter*, 106 Ohio St.3d 418, 2005-Ohio-5411, 835 N.E.2d 707, ¶ 37, citing *Cleveland Bar Assn. v. Dixon*, 95 Ohio St.3d 490, 2002-Ohio-2490, 769 N.E.2d 816, ¶ 15.  Although that presumptive sanction "may be tempered with sufficient evidence of mitigating or extenuating circumstances," *Disciplinary Counsel v. Edwards*, 134 Ohio St.3d 271, 2012-Ohio-5643, 981 N.E.2d 857, ¶ 18, there is just one mitigating factor present in this case—the absence of a prior disciplinary record, *see* Gov.Bar R. V(13)(C)(1).

**{¶ 44}** Adams's clean disciplinary record must be balanced against six aggravating factors.  Adams engaged in a pattern of misconduct by misappropriating settlement proceeds in three separate client matters, by repeatedly failing to respond to communications from clients, and by failing to follow through on commitments he had made to clients, attorneys representing other litigants and lienholders, and relator.  *See* Gov.Bar R. V(13)(B)(3).  He committed multiple offenses—19 rule violations in all—and with the exception of his eventual participation in a single deposition, he failed to cooperate in the disciplinary process.  *See* Gov.Bar R. V(13)(B)(4) and (5).  In addition, Adams failed to

acknowledge the wrongful nature of his conduct and caused harm to vulnerable clients, two of whom were subject to collection actions and another whose Social Security benefits were garnished for nearly three years. *See* Gov.Bar R. V(13)(B)(7) and (8). Furthermore, he failed to make restitution to his clients and others harmed by his misconduct. *See* Gov.Bar R. V(13)(B)(9).

**{¶ 45}** The board considered four cases in which we permanently disbarred attorneys for misconduct similar to that of Adams. Of those cases, we find *Cleveland Bar Assn. v. Glatki*, 88 Ohio St.3d 381, 726 N.E.2d 993 (2000), and *Disciplinary Counsel v. Muhlbach*, 104 Ohio St.3d 340, 2004-Ohio-6563, 819 N.E.2d 698, to be most instructive.

**{¶ 46}** In *Glatki*, we permanently disbarred an attorney for neglecting five client matters, failing to carry out contracts of employment in those matters, engaging in dishonesty with respect to clients in three of those matters, failing to comply with the requests of two clients for copies of their files, and failing to refund a single $500 retainer upon request. Just four of the six aggravating factors present in Adams's case were present in Glatki—namely, Glatki engaged in a pattern of misconduct, committed multiple offenses, failed to cooperate in the disciplinary process to the point that a default judgment was entered against her, and failed to pay $500 in restitution in a single case. *See id*. at 381-382, 384. No mitigating circumstances were evident from the record. *Id*. at 384.

**{¶ 47}** Similarly, in *Muhlbach*, we disbarred an attorney who had misappropriated nearly $25,000 in trust distributions belonging to two minor clients, failed for nearly a year to respond to the requests of the clients' parents for an accounting of those funds, and paid just $1,400 in restitution by the time of our decision. Like Adams, Muhlbach engaged in a pattern of misconduct, committed multiple offenses, and failed to make timely restitution. *See Muhlbach* at ¶ 8-9. Although he failed to fully and freely disclose his wrongdoing during the resulting disciplinary investigation, Muhlbach ultimately stipulated to the charged

misconduct. *Id*. at ¶ 2, 8-9. On the other hand, Muhlbach presented no mitigating evidence and had twice been disciplined—once for his failure to cooperate in a disciplinary investigation and a second time for his neglect of an entrusted matter *and* failure to cooperate. *See id*. at ¶ 2.

**{¶ 48}** In *Cleveland Metro. Bar Assn. v. Freeman*, 128 Ohio St.3d 421, 2011-Ohio-1483, 945 N.E.2d 1034, the attorney engaged in comparable acts of misconduct with respect to eight separate client matters. Among other violations, Freeman misappropriated or failed to timely distribute clients' settlement proceeds in four matters, failed to resolve a Medicare lien on behalf of one of those clients, engaged in multiple instances of neglect, failed to reasonably communicate with clients, made false statements to clients and relator's investigator, and failed to cooperate in the disciplinary proceedings. In addition to the aggravating factors present in this case, we found that Freeman had acted with a dishonest or selfish motive. *See id*. at ¶ 23. And as in this case, the only mitigating factor in *Freeman* was the absence of prior discipline. *See id*. Given that the presumptive sanction for misappropriation is permanent disbarment and the nearly complete absence of mitigating factors, we found that the only appropriate sanction for Freeman's misconduct was disbarment. *See id.* at ¶ 23-25.

**{¶ 49}** In light of the facts of this case and our applicable precedent, we agree that permanent disbarment is the only proper sanction for Adams's misconduct in this case, which includes significant acts of neglect, misappropriation, and dishonesty.

## CONCLUSION

**{¶ 50}** Accordingly, Dennis Lee Adams is permanently disbarred from the practice of law in Ohio. In addition, he is ordered to pay $542.69 to the Preble County Court of Common Pleas for costs incurred in case No. 20CV032045 and to make restitution in the amounts of $12,971.74 to Teresa and Jerry McAdams,

$3,836 to R.R. and/or Kevin Connell, $5,300 to FedEx Custom Critical, Inc., and $3,287 to Eileen Weske.  Costs are taxed to Adams.

Judgment accordingly.

KENNEDY, C.J., and FISCHER, DEWINE, DONNELLY, STEWART, and DETERS, JJ., concur.

BRUNNER, J., not participating.

————————————

Joseph M. Caligiuri, Disciplinary Counsel, and Karen H. Osmond and Martha S. Asseff, Assistant Disciplinary Counsel, for relator.

————————————