CUYAHOGA COUNTY BAR ASSOCIATION *v.* MAYBAUM.

[Cite as *Cuyahoga Cty. Bar Assn. v. Maybaum,*
112 Ohio St.3d 93, 2006-Ohio-6507.]

(No. 2006–0461—Submitted June 20, 2006—Decided December 27, 2006.)

**Per Curiam.**

{¶ 1} Respondent, Scott D. Maybaum of Solon, Ohio, Attorney Registration No. 0030587, was admitted to the practice of law in Ohio in 1978. On May 7, 2003, we ordered the suspension of his license for six months because he repeatedly commingled a client's funds with his own and did not pay a mediated settlement amount to his client as required. We stayed the suspension on conditions. *Cuyahoga Cty. Bar Assn. v. Maybaum,* 98 Ohio St.3d 507, 2003-Ohio-2062, 787 N.E.2d 1180.

{¶ 2} On June 10, 2005, relator, Cuyahoga County Bar Association, charged respondent in an amended complaint with additional violations of the Code of Professional Responsibility. Respondent answered, and a panel of the Board of Commissioners on Grievances and Discipline heard the cause, made findings of misconduct, and recommended a sanction. The board adopted the panel's findings of misconduct, but determined that a sanction more rigorous than recommended was required.

{¶ 3} Relator's amended complaint charged two counts of misconduct, but the panel unanimously dismissed the charges in Count II. Relator has not objected to the dismissal, which we do not review. *Cuyahoga Cty. Bar Assn. v. Marosan,* 109 Ohio St.3d 439, 2006-Ohio-2816, 848 N.E.2d 837, ¶ 13. Thus, we focus our review on the board's findings as to the first count of the complaint and

respondent's objections to the board's recommended sanction, which he claims is too severe.

## Misconduct

{¶ 4} Beginning in June 1998, respondent represented Dianne Cannon–Barron in an action for damages that she had suffered in an automobile accident. Respondent had previously represented Cannon–Barron in her 1995 divorce, and the two had been friends. Respondent and Cannon–Barron agreed that he would be paid on a contingent-fee basis, although this agreement was not committed to writing.

{¶ 5} In March 1999, respondent settled Cannon–Barron's claim for $23,000. Respondent also received $5,000 on Cannon–Barron's behalf for her medical expenses from the accident, which totaled $6,976.12. Toward the end of the month, Cannon–Barron agreed to a projected distribution of the settlement proceeds and accepted her portion of the funds, minus the amount that she still owed respondent for her divorce. Respondent and Cannon–Barron agreed that he would retain $6,976.12 out of this sum, attempt to negotiate a discount for Cannon–Barron's outstanding medical bills, pay the negotiated discount, and then forward any remaining balance to her.

{¶ 6} Pursuant to these arrangements, respondent deposited $6,976.12 in his Interest on Lawyer Trust Accounts ("IOLTA") account in March 1999. He did not, however, immediately start negotiations to lower Cannon–Barron's medical bills. He instead withdrew the funds for his personal and office expenses. Not until July 23, 2004, after Cannon–Barron filed a grievance with relator, did respondent fully refund $3,359.48, the sum remaining after negotiations with creditors, to Cannon–Barron. In the meantime, he continued to attempt to placate his client about the overdue medical bills that her creditors were attempting to collect.

{¶ 7} Respondent admitted that he had misused and had not accounted for Cannon–Barron's funds and those owed her medical providers. The panel and board thus found that respondent had violated DR 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law), 6–101(A)(3) (prohibiting neglect of an entrusted legal matter), 9–102(B)(3) (requiring a lawyer to maintain complete records of all funds of a client and to render appropriate accounts), and 9–102(B)(4) (requiring a lawyer to promptly pay or deliver funds in the lawyer's possession that the client has requested and is entitled to receive). We agree that respondent violated these Disciplinary Rules by misappropriating for over four years the money to pay Cannon–Barron's creditors.

## Sanction

{¶ 8} In deciding the appropriate sanction, we consider respondent's background and weigh the mitigating and aggravating factors of his case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 9} Respondent graduated from Case Western Reserve University School of Law in 1976. He has been practicing in Ohio since 1978, is also licensed in California, and is a certified public accountant. For most of his career, respondent has been a sole practitioner, and in the last ten years, he has been practicing mainly in domestic relations law.

{¶ 10} Of the specified mitigating factors, we accept the panel and board findings that respondent cooperated with the disciplinary proceedings, providing full and free disclosure of precipitating events. BCGD Proc.Reg. 10(B)(2)(d). We also accept the testimony of an attorney and long-time friend of respondent, who despite respondent's wrongdoing, still attested to his good character, reputation for integrity, and professional competence. BCGD Proc.Reg. 10(B)(2)(e). We note also that respondent and his wife experienced a series of traumatic physical injuries from 1998 through 2000 and that respondent continues to experience serious physical infirmities.

{¶ 11} Also to mitigate the severity of his misconduct, respondent offered his psychiatrist's testimony to establish a mental disability. BCGD Proc.Reg. 10(B)(2)(g)(i) through (iv). To have a significant mitigating effect, a mental disability must be supported by all of the following: (1) the diagnosis of a qualified health-care professional, (2) a determination that the mental disability contributed to cause the misconduct, (3) a sustained period of successful treatment, and (4) a prognosis from a qualified health-care professional that the attorney will be able to return, under specified conditions if necessary, to the competent, ethical, and professional practice of law. Id. See, also, *Disciplinary Counsel v. Hunter*, 106 Ohio St.3d 418, 2005-Ohio-5411, 835 N.E.2d 707, ¶ 26. The panel and board found that respondent did not satisfy these criteria, and we agree with that determination.

{¶ 12} Dr. Douglas McLaughlin has been treating respondent for bipolar disorder since 2002, but respondent has seen a battery of psychiatrists and psychologists since the 1980s. At his deposition, Dr. McLaughlin categorized respondent as stable, "able to function at a fairly high level, all things considered," and capable of practicing law without restriction. On further questioning, however, Dr. McLaughlin admitted that respondent had unilaterally altered the dosage of prescribed medication and had sometimes stopped taking his medication completely, once explaining that the pills were too hard to break in half.

According to his doctor, respondent was also chronically late, recently by nearly one year, in reporting for necessary lab tests. In fact, Dr. McLaughlin conceded that respondent might never follow his orders conscientiously.

{¶ 13} Donald Jay Weinstein, Ph.D., also clinically evaluated respondent, and he was much less optimistic about respondent's prognosis. Although both experts diagnosed respondent as having bipolar disorder, Dr. McLaughlin dismissed Dr. Weinstein's report as inaccurate and not projecting a "full picture" of respondent's condition. In adopting the panel's findings, however, the board relied on Dr. Weinstein's report, including an opinion not denied by Dr. McLaughlin that respondent's bipolar disorder did not contribute to or cause his misconduct. The board also agreed, based on respondent's history of resisting recommended treatment measures, with Dr. Weinstein's conclusions that respondent had not had a sustained period of successful treatment and was not able to practice without risk to clients.

{¶ 14} The panel and board also found that respondent has a prior disciplinary record, an aggravating factor under BCGD Proc.Reg. 10(B)(1)(a). We adopt this finding, too, although respondent urges us to ignore the previous sanction for his mishandling of another client's money and refusing to immediately pay a mediated settlement amount. When recalling these events, respondent shrugged off responsibility, exhibiting a trait that became more and more pronounced as the disciplinary proceedings progressed. He explained that he had simply decided that the mediation process was beneath him and that he did not have to repay his client the $1,000 in legal fees that he had promised. Respondent admitted that his decision was "stupid," but then dismissed a panel member's observation that his explanation was "pretty lame," saying, "I'm sorry. I can't do much about it."

{¶ 15} Also over respondent's objection, we agree that respondent was motivated by dishonesty and self-interest, an aggravating factor under BCGD Proc.Reg. 10(B)(1)(b). Respondent commandeered his client's money for his own use—he knew it was wrong but withdrew the money from his trust account anyway. When asked about his misuse of Cannon–Barron's funds, respondent quipped: "I thought I was better than that and I could just get away with it."

{¶ 16} Pursuant to BCGD Proc.Reg. 10(B)(1)(c) and (d), respondent's use of his client's money also constitutes a pattern of misconduct and multiple offenses. As the panel and board found, respondent stalled negotiations with his client's medical providers and for the most part ignored the client's inquiries and those of some creditors for at least four years. Thus, this was not a single "mistake," as respondent would have us think. To the contrary, respondent repeatedly acted in violation of his professional duties and responsibilities, just as the panel and board determined.

{¶ 17} Moreover, though respondent expressed remorse for his misconduct, we doubt his sincerity. See BCGD Proc.Reg. 10(B)(1)(g). According to Dr. Weinstein, respondent has little regard for the consequences of his actions, and this trait includes his mishandling of Cannon–Barron's money and his refusal to follow his treatment regimen. In fact, when asked why he did not comply with his doctor's orders, respondent debated the meaning of "compliance," arguing that his behavior fell within a "spectrum of compliance" because he usually consulted his doctor when he was disobeying medical instructions.

{¶ 18} The panel and board found that respondent has not been inclined to follow any rules or restrictions put upon him "by society, the bar, or his physicians." We agree. As one example, respondent simply stopped paying his portion of rent when an office-sharing arrangement did not prove as lucrative as he had anticipated. He blamed his office mates, faulting them for not helping him increase his business. Dr. Weinstein testified that this lack of guilt and lack of concern for his obligations to others, a psychopathic component, is a part of respondent's diagnosis that he does not acknowledge.

{¶ 19} Finally, we adopt the panel and board findings as to the harm respondent caused his client by so long delaying payments to her and her creditors. BCGD Proc.Reg. 10(B)(1)(h) (vulnerability of and resulting harm to victims of the misconduct) and (i) (failure to make restitution). Although Cannon–Barron's medical providers were ultimately compensated, Cannon–Barron spent years of frustration having to contend with the providers and the threat of collection agencies. Moreover, this client was a friend whom respondent had known was experiencing personal and financial problems at the time. Respondent's argument that there was "no direct harm" from this delay is just one more example of his refusal to fully appreciate how his actions affect others.

{¶ 20} Weighing these factors and the gravity of respondent's misconduct, the panel declined relator's proposal to disbar and respondent's proposal for a stayed suspension of his license to practice. The panel recommended that respondent receive a 24–month suspension, with 18 months stayed and with his reinstatement to the practice of law subject to the following conditions: Respondent must submit a report from a qualified physician establishing that he has successfully completed a treatment program and is continuing treatment and that he can, to a reasonable degree of medical certainty, return to the competent, ethical, and professional practice of law. If reinstated, respondent must further serve a three-year probation, pursuant to Gov.Bar R. V(9), during which he shall (1) continue treatment with a qualified mental-health professional, comply with all orders for medication and appointments, and arrange for quarterly reports to relator on his progress, and (2) allow his practice to be monitored by an attorney

of relator's choice, who shall counsel respondent on case management, financial responsibility, and client communication skills.

{¶ 21} The board, however, found a partially stayed two-year suspension too lenient. Citing respondent's "continuing, repeated patterns of dishonesty and misconduct," the board recommended an indefinite suspension. Pursuant to Gov.Bar R. V(10)(B)(1), respondent would consequently be unable to petition for reinstatement for at least two years, with any reinstatement to be subject to the conditions suggested by the panel. We accept this recommendation.

{¶ 22} When imposing a sanction for attorney misconduct, we consider the duties violated, the actual or potential injury caused, the attorney's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16; *Cuyahoga Cty. Bar Assn. v. Wise,* 108 Ohio St.3d 164, 2006-Ohio-550, 842 N.E.2d 35, ¶ 28. We have already dealt with all but the sanctions imposed in similar cases.

{¶ 23} Respondent contends that this case is analogous to *Toledo Bar Assn. v. Kramer* (2000), 89 Ohio St.3d 321, 731 N.E.2d 643, and *Dayton Bar Assn. v. Gerren,* 103 Ohio St.3d 21, 2004-Ohio-4110, 812 N.E.2d 1280. In *Kramer,* we ordered a one-year suspension, all stayed on conditions, because a lawyer used funds earmarked for paying a client's medical bills as his own for approximately six months. *Kramer,* 89 Ohio St.3d at 323, 731 N.E.2d 643. In *Gerren,* we suspended a lawyer's license for six months for the same misconduct because the lawyer used the client's money over a period of years. *Gerren,* 103 Ohio St.3d 21, 2004-Ohio-4110, 812 N.E.2d 1280, ¶ 16.

{¶ 24} Though disbarment is the presumptive sanction for misappropriation of client funds and dishonesty, *Disciplinary Counsel v. France,* 97 Ohio St.3d 240, 2002-Ohio-5945, 778 N.E.2d 573, ¶ 11, we tempered our disposition in *Gerren* and *Kramer.* In both cases, the attorneys' misconduct represented an isolated incident in a previously unblemished career. In contrast, the misconduct committed in this case is not respondent's first episode. Moreover, we are confident here that for whatever reason, respondent is not now able to comply with ethical standards.

{¶ 25} Dr. Weinstein assessed respondent as being unable to control impulses, accept societal standards, and experience genuine remorse for misdeeds. In fact, Dr. Weinstein advised that in addition to his bipolar disorder, respondent suffers from a personality disorder, an even more serious condition that can be less amenable to treatment. Dr. Weinstein also testified that in his opinion, this personality disorder was a contributing factor in respondent's misconduct—in lay terms, the personality disorder made spending someone else's money an acceptable solution when respondent needed it. Moreover, when coupled with respon-

dent's bipolar disorder and intractable attitude toward treatment, Dr. Weinstein predicted that his personality disorder could lead to further acts of deceit and selfishness and endanger clients.

{¶ 26} We accept Dr. Weinstein's thorough and compelling assessment. Indeed, respondent's concession to Dr. Weinstein—that respondent is inclined to use the symptoms of his condition to manipulate others' impressions and escape responsibility for his actions—confirms for us that he cannot practice at this time without risk to the public. The recommended indefinite suspension with conditions, including strategies to compel respondent's compliance with medication and therapeutic prescriptions, is thus an appropriate sanction.

{¶ 27} Respondent is therefore suspended indefinitely from the practice of law in Ohio and, pursuant to Gov.Bar R. V(10)(B)(1), may not petition for reinstatement for two years from this order. If respondent petitions for reinstatement at that time, he must comply with the requirements of that rule and submit a report from a qualified mental-health professional establishing that he has successfully completed a treatment program and he is continuing treatment and that he can, to a reasonable degree of medical certainty, return to the competent, ethical, and professional practice of law. Upon reinstatement, respondent must also serve a three-year probation, during which he shall (1) continue treatment with a qualified mental-health professional, comply with all orders for medication and appointments, and arrange for quarterly reports to relator on his progress, and (2) allow his practice to be monitored by an attorney of relator's choice who shall counsel respondent on case management, financial responsibility, and client communication. See Gov.Bar R. V(9). Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, O'CONNOR and LANZINGER, JJ., concur.

O'DONNELL, J., would suspend respondent from the practice of law in Ohio for two years.

LUNDBERG STRATTON, J., dissents.

---

**LUNDBERG STRATTON, J., dissenting.**

{¶ 28} Today this court indefinitely suspends respondent based on one incident of misconduct, the misuse of client funds that were to pay medical providers, assessing a penalty normally reserved for an attorney engaging in a pattern of misconduct. Because I believe that the majority uses respondent's mental illness to justify a stronger sanction, I dissent.

{¶ 29} Both experts diagnosed respondent as having bipolar disorder. In adopting the panel's findings, the board agreed with Dr. Weinstein's conclusions that respondent had not had a sustained period of successful treatment and was not able to practice without risk to clients. This conclusion was based on respondents' history of resisting recommended treatment measures.

{¶ 30} Dr. Weinstein testified that in addition to bipolar disorder, respondent suffers from a personality disorder, an even more serious condition that can be less amenable to treatment, according to Dr. Weinstein, who also testified that this personality disorder was a contributing factor in respondent's misconduct. However, Dr. Weinstein testified that respondent's lack of guilt and concern regarding his obligations to others, a psychopathic component, is a part of respondent's diagnosis that respondent does not acknowledge.

{¶ 31} Clearly, protecting clients from attorney misconduct is paramount. In my view, respondent can be sufficiently disciplined by his suspension from the practice of law for a definite period of time on the condition that he must comply with the requirements of Gov.Bar R. V(10)(E)(2) and submit a report from a qualified mental-health professional establishing that he has successfully completed a treatment program, that he is continuing treatment, and that he can, to a reasonable degree of medical certainty, return to the competent, ethical, and professional practice of law. Further, upon reinstatement, respondent should also serve a three-year probation, during which he shall (1) continue treatment with a qualified mental-health professional, comply with all orders for medication and appointments, and arrange for quarterly reports to relator on his progress, and (2) allow his practice to be monitored by an attorney of relator's choice, who shall counsel respondent on case management, financial responsibility, and client communication. See Gov.Bar R. V(9). These conditions, recommended by the panel, would protect the public.

{¶ 32} However, we have instead indefinitely suspended respondent. Because he had one disciplinary action unrelated to this complaint in May 2003, I agree that this misconduct merits an actual suspension. However, we usually reserve an indefinite suspension for a more severe pattern of misconduct.

{¶ 33} The panel that heard the case recommended a 24–month suspension with 18 months stayed upon the very restrictive conditions recited previously. However, the board and this court have increased the discipline to an indefinite suspension, citing in part respondent's mental illness and noncompliance with treatment. His treating physician clearly related the noncompliance to his mental illness: it was indeed a part of the manifestation of his mental illness. Mental illness is usually a mitigating factor, not an aggravating favor, in disciplinary cases.

{¶ 34} We have a formal process that may be used to suspend an attorney with a mental illness that substantially impairs his or her ability to practice law. See Gov.Bar R. V(7). The mental-illness suspension process, however, does not make a finding of fault on the underlying complaints. If the majority believes that respondent is not fit to practice *because* of his mental illness, a mental-illness suspension is the appropriate process by which to suspend respondent, not an increase in discipline.

{¶ 35} To indefinitely suspend respondent based on one incident of misconduct following his stayed suspension in 2003 is to use his mental illness as a sword against him. I respectfully dissent.

---

Robert L. Steely; Ellen S. Mandell, Bar Counsel; and Jeremy T. Browner, for relator.

William T. Doyle, for respondent.