CLEVELAND BAR ASSOCIATION *v.* MISHLER.

[Cite as *Cleveland Bar Assn. v. Mishler,*
118 Ohio St.3d 109, 2008-Ohio-1810.]

(No. 2007–0344—Submitted July 10, 2007—Decided April 23, 2008.)

CUPP, J.

{¶ 1} Respondent, Howard V. Mishler of Westlake, Ohio, Attorney Registration No. 0007281, was admitted to the practice of law in Ohio in 1973. The Board of Commissioners on Grievances and Discipline recommends that we now suspend respondent's license to practice for one year, staying the last six months on conditions, based on findings that he committed multiple violations of the Code of Professional Responsibility.

{¶ 2} On review, we agree with the board that respondent committed professional misconduct to the extent that he accepted a settlement offer without his client's knowledge, obtained settlement proceeds with forged client endorsements, charged excessive fees, and failed to account for client funds. Such serious breaches of our profession's ethical duties, however, require a more exacting sanction than the board recommended. We therefore order a two-year suspension of respondent's license to practice, the second year of which will be stayed provided that respondent complies with conditions for his rehabilitation and reimburses his clients, and we order a one-year probation period upon reinstatement.

{¶ 3} Relator, Cleveland Bar Association, initiated these proceedings by charging respondent in three counts with numerous violations of the Disciplinary Rules. In August and October 2006, a panel of the board heard the case, including the parties' stipulations, and then made findings of fact and conclusions of law. The panel recommended the one-year suspension with six months stayed and one year of probation. The board adopted the panel's findings of misconduct and recommendation.

{¶ 4} Both parties have objected to the board's report. Respondent objects to the board's finding that he violated rules governing lawyers' fee-sharing, arguing that he did nothing wrong by paying a lawyer who was not a member of his law

firm to appear for him at proceedings. Relator objects to the recommended sanction, arguing that the board was too lenient.

## Misconduct

### Count I—Dellipoala Settlement Improprieties

{¶ 5} Franco J. Dellipoala Jr. retained respondent in fall 2000 to sue his former employer, a company then doing business as the Geon Company, for employment discrimination. According to Dellipoala, respondent promised to pursue the discrimination case in state and federal trial courts for $10,000 or "40 percent of the award" plus $2,000 "if an appeal occurred." By May 2001, Dellipoala had paid respondent installments totaling $17,600.

{¶ 6} Respondent filed a complaint in December 2000 in Cuyahoga County Common Pleas Court on Dellipoala's behalf. In June 2001, over respondent's opposition, that court granted Geon's motion for summary judgment. In July, after Dellipoala apparently agreed to a new $3,000 fee, respondent appealed. Respondent claims that the parties discussed settlement at about this time and that Geon offered $7,500 to resolve the dispute. Respondent would later accept this offer.

{¶ 7} Also in June 2001, respondent filed a complaint in the United States District Court for the Northern District of Ohio. In October 2001, the district court designated a neutral to evaluate the case. According to the court's docket, the parties had reached a settlement by December 14, 2001. The district court dismissed the case on February 12, 2002, noting, "Counsel has notified the Court that the above-captioned case is settled and dismissed, with prejudice."

{¶ 8} In early March 2002, respondent and Geon's counsel filed a joint stipulation in the state court of appeals, advising that they had settled the case and canceling an impending oral argument. Later that month, the court of appeals dismissed the Dellipoala appeal "pursuant to parties [sic] joint stipulation to cancel oral argument due to settlement."

{¶ 9} Dellipoala did not authorize respondent to settle his state and federal discrimination claims. In fact, when respondent had presented the $7,500 offer during the federal mediation proceedings, Dellipoala flatly rejected it, asking respondent, "[W]hy would I settle for $7,500 when I spent over $17,000 with you?"

{¶ 10} Dellipoala did not learn that respondent had settled his claims for more than six months after the state and federal cases were dismissed. His first indication came in a November 14, 2002 letter with which respondent enclosed a settlement agreement. Respondent's letter advised that oral argument in the state appeal "did not ensue because of the illness which had gripped myself and

other members of my family causing me to develop an exacerbated and prolonged illness." The letter continued with this curious passage:

{¶ 11} "I do recall that contemporaneously, but prior to, my exacerbated illness and the unforeseen and shocking malady that I underwent, that there was an offer for $7,500 from [Geon]. This recollection was brought to fruition by the receipt of a communication on or about 10/28/02 from [Geon's] counsel indicating that as a courtesy to me, that the offer, hence the case, remained unresolved as of October 2002. I am forwarding a copy of the letter and the settlement agreement I received on or about October 2002. I am still developing a method to approach the burden of bringing everything current or active that was allowed to slip into the proverbial doldrums out of professional courtesy and professionalism directed towards myself and my family."

{¶ 12} Dellipoala did not return the settlement agreement. Notwithstanding, respondent sent Geon's counsel a settlement agreement in December 2002 that bore an endorsement purporting to be Dellipoala's signature and dated November 5, 2002. Later that month, Geon's counsel sent respondent a $7,500 check dated March 4, 2002, and made payable to "Franco Dellipoala and attorney Howard Mishler." Respondent negotiated the check, which also purported to be endorsed by Dellipoala. Dellipoala denied having signed or having approved either the settlement agreement or the check.

{¶ 13} In February 2003, Dellipoala, lodged a grievance with relator, still unaware of the dismissals and settlement. In reply, respondent reported that Geon had made the $7,500 settlement offer in July 2001, during an attorneys' conference in the state court of appeals and that he had entertained the offer because recent case law had diminished his client's chances of proving unlawful discrimination. Respondent then characterized his November 16, 2002 letter as notice to Dellipoala that the $7,500 settlement "was still available." Respondent also reported that a six-year statute of limitations applied to Dellipoala's state claim and that respondent could therefore "reactivate" the claim if Dellipoala wanted to risk losing his entire $17,600 "investment," including the $7,500 settlement amount that respondent saw as an offset to that loss.

{¶ 14} In mid-August 2004, Dellipoala asked respondent in writing for a progress report or the return of his $17,600. Respondent sent Dellipoala a check for $8,000 in April 2005, but the check was returned as undeliverable.

{¶ 15} Respondent settled and dismissed Dellipoala's state and federal claims without his client's authority. In executing the unauthorized settlement agreement, respondent oversaw the process through which Dellipoala's signature was affixed without his permission. Respondent compounded these improprieties by allowing the unauthorized endorsement of Dellipoala's signature on the settle-

ment check and paying none of those proceeds to his client. He also failed to refund any unexpended funds.

{¶ 16} We adopt the board's findings that respondent thereby violated DR 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), 1–102(A)(6) (prohibiting conduct that adversely reflects on the lawyer's fitness to practice law), 7–101(A) (prohibiting a lawyer from intentionally failing to seek a client's lawful objectives), 7–101(A)(3) (prohibiting a lawyer from damaging or prejudicing a client during representation), 9–102(B)(1) (requiring a lawyer to promptly notify a client of received funds belonging to the client), and 9–102(B)(4) (requiring a lawyer to promptly deliver requested funds that the client is entitled to receive).

### Count II—Dellipoala Fee and Accounting Improprieties

{¶ 17} Despite his client's requests, respondent did not account for the fees and expenses charged in pursuing Dellipoala's federal and state discrimination suits until he was asked for this information during relator's investigation. Respondent did not keep track of the time he spent on clients' cases and tried to reconstruct these charges in a "Breakdown of Expenses and Fees" for Dellipoala. In anticipation of the panel hearing, respondent also listed his receipts and disbursements in a "Final Account [for] Franco J. Dellipoala" and presented that prepared document as evidence that he had fully reimbursed his client:

#### RECEIPTS

| | |
|---|---|
| Monies Advanced for Cost | $17,600.00 |
| Settlement Proceeds | $ 7,500.00 |
| Total | $25,100.00 |

#### DISBURSEMENTS

| | |
|---|---|
| Investigative Fee | $ 1,000.00 |
| Filing Fee | $ 100.00 |
| Monroe Arlen, MD Report | $ 500.00 |
| State Appeal — Agreed Fee | $ 3,000.00 |
| Rhonda's Secretarial Service-Deposition of Mike Guyer | $ 471.00 |
| Rhonda's Secretarial Service-Deposition of Jeffrey Ames | $ 590.00 |
| Filing Fee | $ 100.00 |
| Copy of Franco Dellipoala's Deposition | $ 731.75 |
| Mitchell Wax, Ph.D Report | $ 440.00 |
| Xeroxing and Postage | $ 40.00 |
| Attorney Fees for Settlement (1/3 of $7,500) | $ 2,500.00 |
| Distribution to Franco Dellipoala of Settlement Proceeds | $13,127.25 |

And costs ($8,627.25 and $4,500)

(Check # 6142 for $8,627.25 [which respondent claimed was reimbursement for costs not incurred], Account 0166168)

(Check # 1492 for $4,500 [which respondent paid as his client's share of settlement proceeds], Account 0689090)

| | |
|---|---|
| Total Disbursements | $25,100.00 |
| Balance | 0 |

{¶ 18} Inaccuracies in this after-the-fact summary cast grave doubt on the account. First, the listed disbursements actually add up to $22,600. Second, respondent testified at the panel hearing that under the terms of his engagement contracts with Dellipoala, respondent should have calculated his fee by taking 40 percent of the $7,500 settlement amount, making that disbursement $3,000. With this new figure, the total disbursements equal $23,100. And whether disbursements total $22,600 or $23,100, receipts minus disbursements do not produce a zero balance—the balance equals either $2,500 or $2,000.

{¶ 19} Inconsistencies also exist between the final account and other documents. Respondent reported in his breakdown of expenses and fees that the Mike Guyer deposition had cost $810, not $471, and that the Jeff Ames deposition had cost $630, not $590. And in a February 2005 letter to an officer investigating Dellipoala's criminal allegations, respondent reported that Dellipoala's deposition had cost $800, not $731.75.

{¶ 20} Moreover, we share the board's skepticism toward the amount of respondent's fees and expenses generally. We suspect the legitimacy of these charges first because respondent kept no contemporaneous financial records to substantiate them. Second, by his own account, respondent spent only $6,972.75 of the $17,600 he ostensibly collected to pay expenses. Yet not until the week before the panel hearing did respondent attempt to refund any of the costs he owed his client. He also gave up on paying Delliapoala's share of the settlement proceeds.

{¶ 21} Furthermore, respondent's statements as to the cost of his services and expenses have differed dramatically. An engagement contract, executed without a witness on an unspecified date in October 2000, provided for respondent to represent Dellipoala at the trial level "in any and all matters concerning or in any way concerned with the case, controversy, or dispute known as Dellipoala v. The Geon Company, et al.," excluding state and federal appeals. The contract required Dellipoala to pay respondent (1) a $1,000 retainer for investigating and filing the complaint, (2) "out-of-pocket costs" estimated at $10,000, and (3) one-third of any settlement proceeds received before filing suit and 40 percent of any settlement received afterward. A second contract, executed on an unspecified date in June 2001 and signed by respondent, witnesses, and apparently Dellipoala, contains essentially the same terms.[1]

---

1. Asked why he had both of these contracts, respondent explained that the first contract covered state-court claims and the second covered federal-court claims. Given that respondent promised to provide the same representation in each contract, however, this explanation raises serious questions

{¶ 22} But in reply to the Dellipoala grievance, respondent reported having had "a fee of Ten Thousand and No/100 Dollars ($10,000.00), plus one-third (1/3) of any settlement proceeds." Similarly, in a February 2001 invoice, respondent listed $10,000 as his "estimated fee." And in the February 2005 letter to the investigating officer, respondent first wrote: "The case was estimated at $10,000.00. Howard V. Mishler received a $1,000.00 retainer, non-refundable, and was to receive a third of any settlement proceeds plus out-of-pocket reimbursement." Later, respondent claimed the value of his services to be "$21,000.00 or one-third of the settlement proceeds."

{¶ 23} A longtime practitioner in employment law provided expert testimony that lawyers in that field (1) rarely charge more than $3,000 in fees in advance and (2) rarely, if ever, ask for an all-purpose, lump sum to pay expenses in advance. And as we have seen, respondent is unable to reliably account for the fees and expenses he charged Dellipoala. We therefore adopt the board's findings that respondent violated DR 2–106(A) (prohibiting a lawyer from charging an illegal or clearly excessive fee) and 9–102(B)(3) (requiring a lawyer to keep complete records of all client funds in his possession and to render appropriate accounts to his client).

### Count III—Improprieties in the Walton Case

{¶ 24} Respondent practices law by himself, doing business as Howard V. Mishler Co., L.P.A. In the summer of 2002, Bruce Walton retained respondent to contest his discharge from Rolls–Royce as part of a reduction in force. Respondent promised to sue Rolls–Royce for employment discrimination, among other claims, based in part on theories of "antiquated education" and "physiognomy." Respondent told Walton that he had a 70 to 90 percent chance of winning his case, and this assurance persuaded Walton to hire respondent and forgo a severance package worth approximately $10,000.

{¶ 25} Walton testified that he paid respondent $5,000 for some depositions, with the understanding that respondent would refund this money upon obtaining one-third of any recovery. Respondent testified that after Walton agreed to be a witness for another client's suit against Rolls–Royce, he lowered his fee to $1,000, retaining the additional $4,000 to pay expenses for filing in federal court.

{¶ 26} Respondent filed Walton's complaint against Rolls–Royce in September 2002 in the United States District Court for the Southern District of Ohio. In December 2003, respondent had an attorney who was not a member of his law

about respondent's professional competence beyond the allegations charged against him in this case. Moreover, expert testimony established that lawyers do not customarily charge separately for state and federal employment-discrimination suits because the same facts typically underlie both.

firm appear for him during Walton's deposition. Respondent did not disclose this arrangement to Walton in writing or obtain his consent beforehand. The other lawyer also appeared for respondent at a mediation conference without Walton's prior written consent. Respondent paid the lawyer $20 per hour, never gaining Walton's permission to do so. Walters felt "uncomfortable" without respondent at his deposition and felt "cheated" and "strong armed" without him at the mediation conference.

{¶ 27} The district court granted summary judgment for Rolls–Royce on Walton's federal-law claims and dismissed the remaining state-law claims without prejudice. Respondent appealed, but in November 2004, he stipulated to a voluntary dismissal of the appeal in exchange for Rolls–Royce's agreement not to pursue costs. Walton resignedly consented to the dismissal.

{¶ 28} Respondent did not commit any fee agreement to writing and had no records of the time he spent on Walton's case. He has not been able to reliably account for how he earned or appropriately spent Walton's $5,000. The week before the panel hearing, respondent wrote Walton a $638.75 check as a refund.

{¶ 29} Respondent does not contest the board's findings that he violated DR 1–102(A)(5), 1–102(A)(6), 2–106(A), and 9–102(B)(3) in the course of representing Walton. He does, however, challenge the finding that he violated DR 2–107(A), which addresses when lawyers unaffiliated in practice may legitimately divide or share fees. We adopt the board's uncontested findings of misconduct; however, because we have no specific evidence that respondent shared his fee by charging Walton for the services of a lawyer with whom respondent was not in practice, we sustain respondent's objection and find no violation of DR 2–107(A).

{¶ 30} DR 2–107(A) permits a "division of fees" between lawyers who are not in the same law firm only with the prior consent of the client and when all of the following apply: (1) the division is in proportion to the services performed by each lawyer or, if by written agreement with the client, all lawyers assume responsibility for the representation, (2) the terms of the division and the identity of all lawyers sharing in the fee are disclosed in writing to the client, and (3) the total fee is reasonable. Neither the Code of Professional Responsibility nor the Ohio Rules of Professional Conduct ("Prof.Cond.R."), effective February 1, 2007, define "division of fees." We are guided, however, by paragraph seven of the comment to Prof.Cond.R. 1.5, which describes a "division of fee" as "a single billing to a client covering the fee of two or more lawyers who are not in the same firm."

{¶ 31} Respondent insists that his payment of an hourly rate to a second, unaffiliated attorney whom he described as a "per diem attorney" and an "independent contractor" was not "a division of fees" under the rule. He argues that because he did not separately bill Walton for the second attorney's services, the fee represented "normal" office overhead in the nature of secretarial services.

Respondent further emphasizes that the rule against fee-sharing exists to discourage lawyers from "brokering" clients—the practice of accepting a fee for referring a client without assuming any concomitant responsibility for the client's legal interests. See *Spayd v. Turner, Granzow & Hollenkamp* (1985), 19 Ohio St.3d 55, 62, 19 OBR 54, 482 N.E.2d 1232. Respondent did not engage in this evil and thus concludes that he did not violate DR 2–107.

{¶ 32} Relator and respondent concede that the fee-splitting charge against respondent is the least of his alleged improprieties and that a failure of proof on this issue would ultimately have little effect on our disposition. Relator nevertheless cites *King v. Housel* (1990), 52 Ohio St.3d 228, 556 N.E.2d 501, to establish the charged misconduct. In *King*, we acknowledged that the first lawyer retained by a client was responsible for complying with DR 2–107(A)(1) insofar as charging a contingent or hourly fee for a second unaffiliated lawyer's services:

{¶ 33} "An attorney who employs another attorney to assist him in the representation of a client has a duty to fully disclose to his client the fee agreement with the employed attorney. DR 2–107(A)(1). The duty of full disclosure requires that the amount to be paid and manner of payment, as well as other relevant fee agreements, be disclosed to the client by his attorney." Id., paragraph one of the syllabus.

{¶ 34} The lawyer retained first in *King* engaged a second lawyer to help him try his clients' personal-injury case and told the clients that the second lawyer would be paid on an hourly basis. The lawyers, who were not members of the same firm, did not reduce their fee agreement to writing. The first lawyer paid the second for his hourly work, but afterward, the second lawyer sued to recover an additional ten percent contingent fee, arguing that the lawyers had also agreed to this compensation.

{¶ 35} We were not called upon in *King* to decide whether the contingent-fee agreement existed, because of the procedural posture of the case. But we said that if such an agreement existed, the lawyer retained first had the duty under DR 2–107(A)(1) to provide the clients with written notice of terms for paying a second lawyer. Because the first lawyer had not provided the requisite notice relative to the claimed contingent fee, we concluded that he could not use this deficiency to defeat the fee agreement in dispute.

{¶ 36} Following *King*, we found another attorney in violation of DR 2–107 in *Disciplinary Counsel v. Zingarelli* (2000), 89 Ohio St.3d 210, 220, 729 N.E.2d 1167. That lawyer asked several unaffiliated lawyers to assist him with his client's representation and also later prepared fee statements that charged the client the other attorney's fees in addition to his own. The violation occurred because the retained lawyer did not disclose for the client's consent either the other lawyers' identities or the basis on which the lawyers would be paid.

{¶ 37} But this case differs fundamentally from *King* and *Zingarelli*. In neither of those cases did the lawyers deny that they had charged the client in a single billing for another unaffiliated lawyer's work. In contrast, respondent insists that he did not charge Walton for the work of the "per diem" attorney or share with that lawyer part of his contingent fee, and this record contains no proof to contradict his claim. We therefore have no clear and convincing evidence upon which we can rely to find a "single billing" to Walton covering the "fee of two or more lawyers who are not in the same firm" in accordance with the definition in paragraph seven of the Comment to Prof.Cond.R. 1.5. Accordingly, we do not find a violation of DR 2–107.

{¶ 38} In sustaining respondent's objection, however, we also admonish that his enlistment of, reliance on, and payment to a second lawyer to represent his client are not without ethical difficulty. Notwithstanding issues of improper fee-splitting, lawyers are cautioned against engaging unaffiliated counsel without the client's consent. Such improprieties at least implicate a violation of an attorney's duty to preserve client secrets and confidences and may also impinge on standards demanding an attorney's undivided loyalty to the client.

Sanction

{¶ 39} In determining the appropriate sanction to impose for attorney misconduct, "we consider the duties violated, the actual or potential injury caused, the attorney's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases." *Stark Cty. Bar Assn. v. Ake,* 111 Ohio St.3d 266, 2006-Ohio-5704, 855 N.E.2d 1206, ¶ 44. We weigh the aggravating and mitigating factors to decide whether extenuating circumstances justify lenience in our disposition. See Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline (BCGD Proc.Reg.). We are not limited to the factors specified in the rule and may take into account "all relevant factors" in determining which sanction to impose. Id.

{¶ 40} Respondent flagrantly breached duties to his clients. He did not conscientiously represent his clients' interests, promptly account for and return funds to which the clients were entitled, or charge them reasonable fees. In general, he failed to represent his clients with honesty and integrity.

{¶ 41} As mitigating factors, respondent has no prior disciplinary record, and he submitted letters from colleagues recommending his honesty and character. See BCGD Proc.Reg. 10(B)(a) and (e). Respondent has also refunded money to both clients, the mitigating effect of which is diminished by respondent's delay in waiting until just before the panel hearing to do so. See BCGD Proc.Reg. 10(B)(2)(c). These mitigating circumstances are outweighed by the aggravating factors that respondent acted out of self-interest, committed multiple offenses,

and engaged in a pattern of misconduct. See BCGD Proc.Reg. 10(B)(1)(b), (c), and (d). Also weighing against respondent is that despite a zealous defense, he either could not or would not explain his misdeeds. Indeed, we are confounded, as was the board, by respondent's inability or refusal to account for his actions.

{¶ 42} The board recommended that respondent be suspended from the practice of law for one year with a stay of the last six months on the conditions that he (1) not commit any other ethical violations and (2) fully account to Walton and Dellipoala for his fees and expenses and refunds any funds still owed to them. The board further recommended that respondent be placed on probation for one year upon reinstatement and that he be required to establish an office accounting system that accurately tracks receipts and disbursements of his clients' funds.

{¶ 43} Relator objects to this recommendation, arguing that an indefinite suspension is warranted for misconduct of this magnitude. Though acknowledging that disbarment is the presumptive sanction when a lawyer misappropriates client funds, relator is satisfied that an indefinite suspension of respondent's license, with the attendant requirement of a petition for reinstatement, will provide sufficient protection for the public. We imposed this sanction in *Cuyahoga Cty. Bar Assn. v. Maybaum*, 112 Ohio St.3d 93, 2006-Ohio-6507, 858 N.E.2d 359, ¶ 27, when another lawyer failed to distribute proceeds to his client for years after a settlement.

{¶ 44} "Misappropriation of a client's money cannot be tolerated, and * * * [t]he presumptive disciplinary measure for acts of misappropriation is disbarment." *Dayton Bar Assn. v. Gerren*, 103 Ohio St.3d 21, 2004-Ohio-4110, 812 N.E.2d 1280, ¶ 14. And we have stated as well that an attorney who has violated DR 1–102(A)(4) "will be actually suspended from the practice of law for an appropriate period of time." *Toledo Bar Assn. v. Kramer* (2000), 89 Ohio St.3d 321, 323, 731 N.E.2d 643. *Disciplinary Counsel v. Claflin*, 107 Ohio St.3d 31, 2005-Ohio-5827, 836 N.E.2d 564, ¶ 14.

{¶ 45} *Claflin* confirmed that a lawyer's "months-long misuse of his client's funds, coupled with his misrepresentations * * *, represents serious misconduct that cannot be tolerated in a learned profession grounded on integrity, respectability, and candor." Id. We did not, however, disbar or indefinitely suspend the offending lawyer in that case. That lawyer had no prior disciplinary record and had repaid the misappropriated funds, thereby overcoming concerns about his contrition and lack of any character evidence. We said that the board recommendation for a two-year suspension with one year stayed on conditions "struck the right balance." Id. at ¶ 15.

{¶ 46} A similar sanction is appropriate here. Until these grievances, respondent had practiced without incident for over 30 years, and letters from attorneys

and a former colleague attesting to his good character were submitted. That record deserves consideration in the imposition of any sanction. Although respondent has no prior disciplinary record, the lapses in this case are egregious and unexplained, suggesting that an extended suspension with provisions for an extended stay and probation will be in the best interest of respondent as well as the public.

{¶ 47} We therefore suspend respondent from the practice of law for two years and stay the last year of the suspension on the conditions that respondent (1) not commit any other ethical violations and (2) fully account to Walton and Dellipoala for his fees and expenses and then refund any unverified fees and expenses still owed to them, with interest at the statutory rate for judgments. Upon reinstatement, respondent shall complete a probation period of one year and, in addition to fulfilling the requirements of Gov.Bar R. V(9), establish an office accounting system to accurately track receipts and disbursements of his clients' funds. If respondent fails to comply with the conditions of the stay or probation, the stay will be lifted, and respondent shall serve the entire two-year suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, and LANZINGER, JJ., concur.

---

Tucker, Ellis & West, L.L.P., Robert J. Hanna, and Benjamin C. Sassé, for relator.

Lester S. Potash, for respondent.