**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as**
*Disciplinary Counsel v. Darling***, Slip Opinion No. 2022-Ohio-870.]**

<u>NOTICE</u>

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-870

DISCIPLINARY COUNSEL *v.* DARLING.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Darling*, Slip Opinion No. 2022-Ohio-870.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including failure to safeguard a client's settlement funds and making false statements to his client about the status of those funds, misdemeanor theft conviction for passing bad checks, and dishonest conduct during the ensuing disciplinary proceedings—Indefinite suspension from the practice of law.*

(No. 2021-1232—Submitted November 10, 2021—Decided March 24, 2022.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2020-034.

_____

**Per Curiam.**

**{¶ 1}** Respondent, Stephen Michael Darling, of Columbus, Ohio, Attorney Registration No. 0080930, was admitted to the practice of law in Ohio in 2006. In a June 2021 amended complaint, relator, disciplinary counsel, charged Darling with

eight ethical violations arising from his failure to safeguard a client's personal-injury settlement, false statements to his client about the status of those funds, misdemeanor theft conviction for passing bad checks, and dishonest conduct during the ensuing disciplinary proceedings.

**{¶ 2}** The parties entered into stipulations of fact, misconduct, and aggravating and mitigating factors. After conducting a hearing, a three-member panel of the Board of Professional Conduct accepted the stipulations of fact and misconduct and made some additional findings. Citing the significant aggravating factors present in this case, the panel recommended that we indefinitely suspend Darling from the practice of law in Ohio, with certain conditions on his reinstatement. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. No objections have been filed.

**{¶ 3}** We adopt the board's findings of misconduct and recommended sanction.

### Misconduct

*Count One: The Lusk Matter*

**{¶ 4}** Joshua Lusk was injured in a car accident in October 2016. Later that month, he retained Darling to represent him in his personal-injury claim. He signed a contingent-fee agreement in which he agreed to pay Darling 20 percent of any recovery. Darling faxed a letter of representation to the at-fault driver's insurance company, United Services Automobile Association ("USAA").

**{¶ 5}** Before retaining Darling, Lusk had commenced chiropractic treatment for his injuries. At Darling's direction, Lusk informed the chiropractor's office that he was represented by counsel, directed the chiropractor to send all record and billing statements to Darling, and agreed that his treatment would be paid out of any settlement proceeds. Lusk completed his treatment in December 2016, at a cost of $8,835.

**{¶ 6}** Lusk settled his personal-injury claim in May 2017, and USAA issued a $14,000 check jointly payable to Lusk and Darling. Both Lusk and Darling endorsed the settlement check and Lusk deposited it into his personal bank account. In June 2017, Darling met with Lusk at Lusk's home. At that time, Lusk wrote a $12,000 check payable to Darling, with the understanding that Darling would take his $2,800 legal fee, attempt to negotiate the balance due to the chiropractor, and after paying the negotiated amount, return any remaining funds to Lusk.

**{¶ 7}** Darling did not prepare a closing statement setting forth the distribution of the settlement funds. Nor did he maintain a client trust account. Instead, he deposited Lusk's check into his personal account at Huntington Bank. Between June and November 2017, Lusk and his wife, Lillian Connors, contacted Darling seeking the return of any excess funds.

**{¶ 8}** Darling misappropriated the funds earmarked to pay the chiropractor; by October 5, 2017, his Huntington bank account had a balance of just $5,735.81. In October, Darling sent Lusk a check for $482.40 drawn on Darling's Park National Bank account. On November 2, Darling sent Lusk another check for $500. However, despite his agreement with Lusk, Darling failed to pay the chiropractor.

**{¶ 9}** On November 21, the chiropractor sent Darling a letter demanding immediate payment in full and stating that attempts to reach him by telephone had been unsuccessful. The letter further stated that if no payment arrangements were made within ten business days, the account would be prepared for collection. Darling did not respond to that letter and continued to misappropriate the funds to pay personal expenses. By July 23, 2018, Darling's Huntington bank account contained just $209.20.

**{¶ 10}** In January 2019, the chiropractor sent Darling another letter demanding payment. Darling again failed to respond. The following month, Lusk received a letter notifying him that the chiropractor had sent the debt to collection. Around that time, Connors, Lusk's wife, emailed Darling to request all

documentation regarding Lusk's claim, the settlement, and payments that had been made on Lusk's behalf. On February 28, Darling replied that he was out-of-state and requested the approximate dates of the matter, which Connors provided to him later that day. Darling let Connors know that he would return to town the next day and would "confirm upon arrival."

{¶ 11} On March 1, Connors sent Darling an email to notify him that the debt had been sent to collections. In his response, Darling stated that he would not return to his office for another week, asked Connors to send the documents she had received from the collection agency, and stated that he wondered "why this suddenly came up years later." Darling did not follow up with Connors when he returned from his trip. But in response to a March 19 email from Connors, he stated that he had looked at his old records and determined that the "insurer check was made payable to [Lusk]" and that he had personally delivered the check to Lusk at his home. He also asked for the documentation from the collection agency and offered to "figure this out with them."

{¶ 12} From March 21 through March 26, Connors, Lusk, and Darling exchanged multiple emails. In response to Connors's request for a "statement of fees," Darling stated that he only kept client files for 18 months. He reiterated that he had a record of the check issued by USAA and that he recalled personally delivering it to Lusk. Lusk responded and explained that while Darling had delivered the check, Lusk had then issued a $12,000 check to Darling "to settle all debts owed as a result of the accident and also deduct your fees, per [Darling's] instruction." Lusk went on to state, "I need you to help me understand what happened with the funds once it was entrusted to you. Something had to have been done with it between then and November when you issued a 'payout' check to me. I can't understand why you would have paid me anything, had you not already been paid yourself." Darling replied, stating that he would "look again for any remaining record of the fee statement." He asked, "[I]s the issue what you got paid? Or the

agency contacting you two years later? Just so I understand what I'm looking for." He then asked Lusk, "[D]o you have any idea what triggered this now and not 2+ years ago when the files still existed?"

{¶ 13} Connors responded to Darling, stating:

The settlement was $14K. $2K was kept by Josh to pain & suffering. $12K of the settlement was paid to you to distribute against the bills that were provided to you when the prescribed treatment was concluded and to pay your fee [for] your services. Either you didn't pay the chiropractor, or, you did, and they did not allocate it accordingly in their system. As far as we are concerned, funds were provided with the expectation that they would be distributed to clear all debts owed to the chiropractor per yours and Josh's agreement. We need you to prove that those payments actually took place.

{¶ 14} Connors sent Darling copies of the $12,000 check and a bank statement showing that the check had been cashed. Darling again offered to contact the collection agency and asked Connors to send him all the documents so that he could contact the chiropractor's office. Connors declined Darling's offer to contact the collection agency and again requested documentation regarding the disposition of the $12,000 entrusted to Darling.

{¶ 15} Connors also declined Darling's request to speak with her and Lusk by telephone, stating:

I do not feel that a conversation will be of any benefit to us at this time. The remedy to the situation is cut and dry. Either you paid * * * for the chiropractic care received with the proceeds from

5

the settlement that I already paid you in June of 2017 or you did not.
I feel a direct answer with supporting documentation is a reasonable
request.

**{¶ 16}** Darling replied stating that he intended to obtain outside counsel, that the case was a long time ago and that he was trying to help figure it out after the file was destroyed.  He further blamed Connors and Lusk for his failure to resolve the matter, stating, "You asked for help yet you don't want me to talk with the parties directly involved.  This does not make sense."  After exchanging several more emails, Connors requested whatever paperwork Darling possessed.  Darling complied with that request approximately two weeks later.  When Connors and Lusk reviewed the paperwork, they discovered a copy of a malpractice-insurance waiver that purportedly had been signed by Lusk—but Lusk denied having seen or signed that document.  Thereafter they filed a grievance with relator.

**{¶ 17}** Darling has stipulated that his response to relator's letter of inquiry regarding Lusk and Connors's grievance contained at least four false statements of fact.  Darling falsely stated in his response that he had sent a letter to USAA on May 17, 2017, directing the insurer to pay the chiropractor directly, when in fact, he created that letter in response to relator's letter of inquiry.  Darling also falsely stated that he "did not hold funds related to this matter at any point."  In addition, he falsely claimed that he had incurred $1,913.30 in fees and expenses related to Lusk's representation.  Lastly, Darling falsely claimed that he had sent $500 out of his own pocket to Lusk in November 2017 "[a]s a professional courtesy and because Mr. Lusk had a business relationship with a mutual friend."  Darling refused to stipulate or admit that he had forged Lusk's signature on the malpractice-insurance waiver until immediately before his disciplinary hearing.  In his disciplinary-hearing testimony, Darling admitted that he was not honest with Lusk and Connors and that he had attempted to convince them that he had paid the

chiropractor knowing that he had misappropriated the funds earmarked for that payment.

{¶ 18} Darling stipulated and the board found that his conduct violated Prof.Cond.R. 1.5(c)(2) (requiring a lawyer entitled to compensation under a contingent-fee agreement to prepare a closing statement to be signed by the lawyer and the client detailing the calculation of the lawyer's compensation and any costs and expenses deducted from the settlement), 1.15(a) (requiring a lawyer to hold the property of clients in an interest-bearing client trust account, separate from the lawyer's own property), 1.15(d) (requiring a lawyer to promptly deliver funds or other property that a client or a third party is entitled to receive), 1.15(e) (requiring a lawyer to promptly distribute all funds or other property as to which the interests are not in dispute), 8.1(a) (prohibiting a lawyer from knowingly making a false statement of material fact in connection with a disciplinary matter), and 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). We adopt these findings of misconduct.

*Count Two: Criminal Conduct*

{¶ 19} In May 2020, Darling maintained an account at Park National Bank. From May 7 through May 13, he deposited three checks into that account. On each of the those checks, he had redacted the remitter information on each of those checks and handwrote "7061 Post Preserve Dublin, Ohio 43016" in its place. The first two checks for $1,495 and $1,850, were written on a closed account at Bank of the Internet, and the third check, for $2,490, was written on a closed Huntington Bank account. All three checks were returned by the issuing banks leaving Darling's account overdrawn by $4,250.21.

{¶ 20} In a November 9, 2020 bill-of-information, Darling was charged with two counts of forgery, one count of passing bad checks, and one count of theft—all fifth- degree felonies. On April 1, 2021, he pleaded guilty to the lesser included offense of theft, a first-degree misdemeanor, and the remaining charges

were dismissed. Darling was sentenced to 60 days in jail, suspended on the condition that he pay \$4,250.21 in restitution to Park National Bank and complete 40 hours of community service. He was also ordered to serve one year of probation that was to terminate upon his payment of restitution and completion of community service. Darling had made full restitution to the bank at the time of his sentencing but had not completed his community service at the time of his disciplinary hearing.

{¶ 21} The parties stipulated that Darling's actions related to his theft conviction violated Prof.Cond.R. 8.4(b) (prohibiting a lawyer from committing an illegal act that reflects adversely on the lawyer's honesty or trustworthiness) and 8.4(c).

### Recommended Sanction

{¶ 22} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 23} The board found that five aggravating factors are present, namely Darling (1) acted with a dishonest or selfish motive, (2) engaged in a pattern of misconduct, (3) committed multiple offenses, (4) submitted false evidence, false statements, or other deceptive practices during the disciplinary process, and (5) failed to make restitution in accordance with his stated intentions at his disciplinary hearing. *See* Gov.Bar R. V(13)(B)(2), (3), (4), (6), and (9).

{¶ 24} As for mitigating factors, the board found that Darling has no prior discipline, that he had criminal penalties imposed with respect to count two, and that he made full restitution in the criminal matter—though he has not made restitution in the Lusk matter. *See* Gov.Bar R. V(13)(C)(1), (3) and (6).

{¶ 25} The parties also stipulated that Darling had made full and free disclosure and exhibited a cooperative attitude toward the disciplinary proceedings after relator filed his complaint. The board, however, gave that factor little

mitigating weight because Darling's hearing testimony was, at times, "evasive, equivocal, or not completely forthright." For example, the board noted that Darling initially testified that he went into private practice because he was "ready to sort of go out on my own and see what solo practice was like," implying that he had voluntarily left his employment with the State of Ohio Department of Commerce. It was not until a panel member asked him whether he had left state employment with "a cloud over [his] head" that Darling disclosed that he had been let go because he was performing outside consulting work.

{¶ 26} In determining the appropriate sanction for Darling's misconduct, the board was guided by the principle that the primary purpose of disciplinary sanctions is to protect the public rather than punish the offender. *See, e.g.*, *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 268, ¶ 53. The board considered four cases in which we imposed partially stayed term suspensions for misconduct involving the misappropriation of client funds. Among those cases was *Disciplinary Counsel v. Burchinal*, 133 Ohio St.3d 38, 2012-Ohio-3882, 975 N.E.2d 960. There we imposed a two-year suspension with 18 months conditionally stayed on an attorney who misappropriated settlement proceeds intended to pay the subrogated medical expenses of three clients and concealed his failure to timely file a personal-injury claim on behalf of two others. Although Burchinal acted with a dishonest or selfish motive and engaged in a pattern of misconduct involving multiple offenses as Darling did here, there were also significant mitigating factors in that case that are not present in this one. Specifically, Burchinal self-reported his misconduct, made full restitution to his clients, and established the existence of a mitigating mental disorder. *Id.* at ¶ 16.

{¶ 27} The board found that the facts of this case were most comparable to *Disciplinary Counsel v. Miller*, 126 Ohio St.3d 221, 2010-Ohio-3287, 932 N.E.2d 323, and *Cuyahoga Cty. Bar Assn. v. Maybaum*, 112 Ohio St.3d 93, 2006-Ohio-

6507, 858 N.E.2d 359—two cases in which we indefinitely suspended attorneys who engaged in similar misconduct involving the misappropriation of client funds.

{¶ 28} Like Darling, Miller agreed to keep part of a client's settlement to pay the client's medical bills but deposited the funds into his personal account and converted them to his own use. *Miller* at ¶ 4. Miller also charged a clearly excessive fee and failed to cooperate in the ensuing disciplinary investigation. *Id.* at ¶ 7-8. Although he was not charged with a violation of Prof.Cond.R. 8.1(b) as Darling was in this case, we nonetheless found that his use of deceptive practices during the disciplinary process was an aggravating factor weighing in favor of a greater sanction. *Id.* at ¶ 7-8, 11. Like Darling, Miller also acted with a dishonest or selfish motive, refused to acknowledge the wrongful nature of his misconduct, and failed to make restitution. But the only mitigating factor in *Miller* was a lack of prior discipline. *Id.* at ¶ 11.

{¶ 29} Similarly, Maybaum held back a portion of a client's settlement proceeds and represented that he would attempt to negotiate a discount with the client's medical provider, pay the negotiated rate, and then forward any remaining balance to his client. Instead of immediately commencing negotiations to lower his client's medical bills, he misappropriated the funds and tried to placate his client as her creditors attempted to collect the overdue medical bills. *Maybaum* at ¶ 6. In addition to aggravating factors like those present in the current case, Maybaum had previously been disciplined for the same type of misconduct. *Id.* at ¶ 14. The mitigating factors in the *Maybaum* case included Maybaum's cooperation in the disciplinary proceeding and evidence of his good character and reputation. Also, Maybaum eventually negotiated his client's medical bills and refunded the remaining settlement proceeds after the client filed a grievance against him. Darling, on the other hand, has failed to pay Lusk's medical bills or otherwise make restitution in this case—even after he represented at his disciplinary hearing that

10

payment was forthcoming and the panel chair held the record open to receive proof of that payment.

{¶ 30} Here, in addition to misappropriating client funds as Burchinal, Miller, and Maybaum did, Darling was convicted of a first-degree-misdemeanor theft offense for writing bad checks on his own closed bank accounts, depositing those checks into another bank account, and withdrawing the funds before the checks were returned. Then, at his disciplinary hearing, he attempted to frame his misconduct as a series of "mistakes" and did not admit that his conduct was intentional until forced to do so under direct questioning. Furthermore, when Darling was asked where he spent the settlement proceeds that he had misappropriated from Lusk, he stated that he had spent them on ordinary expenses like rent, food, gas, and insurance. But when pressed by the panel members, he acknowledged that he had traveled to Florida and Aruba. As the board stated, "[Darling] only admits to those actions that he cannot evade."

{¶ 31} On these facts we adopt the board's recommendation that Darling be indefinitely suspended from the practice of law, that his reinstatement to the practice of law be conditioned on his payment of restitution, submission to an Ohio Lawyers Assistance Program ("OLAP") evaluation, compliance with all treatment recommendations arising from that evaluation, and that upon reinstatement, he be required to work with a monitoring attorney.

### Conclusion

{¶ 32} Accordingly, Stephen Michael Darling is indefinitely suspended from the practice of law and ordered to make restitution of $8,835 to Lifestyle Medical Solutions, formerly known as Spine and Sports Chiropractic Center, within 60 days of this order. In addition to the requirements of Gov.Bar R. V(25), Darling's reinstatement to the practice of law shall be conditioned upon the submission of proof that he has submitted to an evaluation conducted by OLAP and is in compliance with any treatment recommendations arising from that evaluation.

Upon reinstatement to the practice of law, Darling may be required to work with a monitoring attorney for a period of time and under such conditions as are determined during the reinstatement process. Costs are taxed to Darling.

Judgment accordingly.

O'CONNOR, C.J., and KENNEDY, FISCHER, DeWINE, DONNELLY, STEWART, and BRUNNER, JJ., concur.

_____

Joseph M. Caligiuri, Disciplinary Counsel, Donald M. Scheetz, Chief Assistant Disciplinary Counsel, and Kelli Christine Schmidt, Assistant Disciplinary Counsel, for relator.

Montgomery Jonson, L.L.P., and George D. Jonson, for respondent.

_____